The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Clifford W. JOHNSON,
Defendant–Appellee.

No. 79SA471.

Supreme Court of Colorado.

Oct. 20, 1980.

Dale Tooley, Dist. Atty., Second Judicial District, Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff–appellant.

Sadler & Owen, Christopher Sadler, Artie M. Owen, Denver, for defendant–appellee.

DUBOFSKY, Justice.

The People appeal an order of the district court dismissing an information charging the defendant, Clifford W. Johnson, with felony theft, section 18–4–401, C.R.S.1973

(now in 1978 Repl.Vol. 8). The trial court dismissed the information at the conclusion of the preliminary hearing because it found probable cause that the defendant committed the crime of theft had not been established. We reverse.

The Denver Junior Chamber of Commerce, Inc. (Jaycees), and W.R.G. Enterprises, Inc. (WRG), a Florida corporation, contracted on July 10, 1978, that WRG would sell tickets to a show, the "Hippodrome," to be produced by WRG as a fundraiser for the Jaycees. As one of its duties, WRG was to employ a sales manager to oversee telephone solicitation of ticket sales. David Fogel, president of the Jaycees, and Jack Watling, president of WRG, signed the contract. WRG hired the defendant as its sales manager.

Under the contract, receipts from ticket sales were to be deposited in a joint bank account.[1] The contract also provided that the cost of the telephone campaign was to be forty–five percent of the collected gross telephone sales. This sum was to be remitted to the sales manager as a commission. Of the forty–five percent gross receipts, thirty–five percent was to be paid to the sales manager upon collection and the remaining ten percent was to be paid to him weekly. The sales manager was to pay his sales personnel and specified expenses from his commission. Fifty percent of the net profit from the show was to be paid to the Jaycees and fifty percent to WRG; in the event expenses exceeded revenues, WRG was to hold the Jaycees free from any financial loss.

In July, 1978, the defendant and Fogel, the Jaycees' authorized representative, opened a joint account at the Bank of Den-

---

1. The contract provided:
   "2. Sponsor agrees to:
   A. Open a joint bank account with the Sales Manager and Sponsors authorized representative for the purpose of completing transactions connected with sales campaign.
   \* \* \* \* \* \*
   3. It is Mutually Agreed:
   A. That the joint bank account shall be known as the General Fund and all monies from all sales collected prior to Midnight before Show Day shall be deposited into this account. All General Fund expenses shall be paid by check from this account . . . .
   B. ... Cost of telephone campaign is 45% of collected telephone sales. Sales Manager shall be paid 35% of gross telephone sales upon collection and balance of 10% is to be paid to XXXXXX or his Authorized Representative on a weekly basis. Sales Manager shall pay his sales and delivery personnel, secretarial costs, office equipment, and personal expenses from his commissions."

ver. The defendant met with Fogel several times in July to discuss receipts and expenditures. Ticket sales were slow, and the defendant and Fogel did not meet after the first of August.

In August, Fogel received several calls from creditors asking to be paid for services provided to the fundraiser. Fogel then discovered that the defendant had opened another account at the Western National Bank (the Western account) in the name of "J.C. Show Fund Payroll Account."[2] About $1,500 in checks payable to the Jaycees had been deposited in the Western account. No bills for fund drive expenses were paid from the Western account; however, the defendant wrote checks against that account made out to cash, Sears, and Best Buy Cars. Fogel filed a complaint with the Denver Police, and a subsequent investigative report calculated the unauthorized expenditures from contributions at $1,567.33.

At the preliminary hearing, Detective Fennell of the Denver Police Department testified, based on a telephone conversation with Watling, that the defendant was not authorized to open any account, other than the Bank of Denver account, in the Jaycees' name. All of the defendant's expenses were to be paid from the joint account.

Fogel testified at the preliminary hearing that the defendant was to deposit all money raised by the telephone solicitation in the Bank of Denver account and to pay all expenses from that account. Fogel further testified that the other two accounts were not authorized by the Jaycees or WRG. He also testified that the defendant was to meet with him not less than weekly. Although Fogel saw the defendant daily while the solicitation office was being set up, he only brought receipts and checks payable to proper parties to Fogel for his approval once or twice.[3] Fogel testified that the defendant did not thereafter report to him

as frequently as he had expected. Fogel left daily telephone messages with the defendant's wife. When the defendant did not return the calls, Fogel requested WRG to send an investigator from Florida. Fogel testified that early in August, while he was waiting for the investigator to arrive, he instructed his secretary to refuse to put any telephone calls from the defendant through to him.

The defendant testified that WRG promised to pay him $250 a week, irrespective of the success of the ticket sales campaign. WRG did not pay him anything, and when he attempted to call WRG, none of his numerous calls were returned. Fogel also failed to return his telephone calls, and when he tried to make appointments to see Fogel, Fogel refused to see him. The defendant testified that he had no other income, and that he incurred personal liability for fundraising expenses.

The defendant acknowledged that the only bank account authorized by the contract between WRG and the Jaycees was the account at the Bank of Denver, but he contended that because he was not a party to the contract he was not bound by its terms. When WRG and the Jaycees refused to return his calls, he put promotion receipts into the Western account, and paid his daily employees with cash from that account. He also acknowledged that he withdrew money from that account to pay personal expenses.

At the conclusion of the testimony, the trial court found that the contract between WRG and the Jaycees did not forbid the defendant as sales manager to open more than one account. The trial court also found that any control the defendant exercised over the funds was authorized by the contract, and that the prosecution had not proved deception or the defendant's specific intent to deprive anyone of the monies in-

---

2. Evidence at the preliminary hearing indicated that the defendant opened a third "Show Account" at the Golden State Bank, but it was not the subject of the present prosecution.

3. Although the contract did not require a joint *signatory* account, prosecution witnesses and the defendant testified that Fogel and the defendant were both to sign each check drawn on the joint account.

volved.[4] The court therefore concluded there was no cause to believe that a crime was committed and dismissed the information.

By basing its conclusion that probable cause did not exist on the express provision of the Jaycees–WRG contract and its interpretation of the defendant's employment agreement with WRG, the trial court disregarded relevant testimony elicited from prosecution witnesses at the preliminary hearing. Its resolution of the issue was tantamount to a final adjudication of the merits of the People's case.[5]

■ The preliminary hearing is a screening device used to determine whether probable cause exists to support charges that an accused committed a particular crime. *People v. Treat*, 193 Colo. 570, 568 P.2d 473 (1977); *Maestas v. District Court*, 189 Colo. 443, 541 P.2d 889 (1975); Crim.P. 7(h). The probable cause standard requires evidence sufficient to induce a person of ordinary prudence and caution to a reasonable belief that the defendant committed the crimes charged. *People v. Armijo*, 197 Colo. 91, 589 P.2d 935 (1979); *People v. Treat, supra.*

■ The evidence presented must be viewed in the light most favorable to the prosecution; evidence sufficient to support a conviction is not necessary at this stage of the proceedings. *People v. Armijo, supra; People v. Treat, supra; People v. District Court*, 186 Colo. 136, 526 P.2d 289 (1974). If the testimony conflicts, the trial court must draw an inference for the prosecution. *Miller v. District Court*, 193 Colo. 404, 566 P.2d 1063 (1977).

■ Therefore, the duty of the trial court in this case was to evaluate the sufficiency of the evidence presented at the hearing to establish probable cause that the defendant committed felony theft under section 18–4–401, C.R.S.1973 (1978 Repl.Vol. 8).

Section 18–4–401 provides:

"(1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:

(a) Intends to deprive the other person permanently of the use or benefit of a thing of value; . . . .

\*       \*       \*       \*       \*       \*

(2) Theft is:

\*       \*       \*       \*       \*       \*

(c) A class four felony if the thing of value involved is two hundred dollars or more but less than ten thousand dollars;

\*       \*       \*       \*       \*       \*

(6) In every indictment or information charging a violation of this section, it shall be sufficient to allege that, on or about a day certain, the defendant committed the crime of theft by unlawfully taking a thing or things of value of a person or persons named in the indictment or information. The prosecuting attorney shall at the request of the defendant provide a bill of particulars."

Intent to permanently deprive may be inferred from the defendant's conduct and the circumstances of the case. *People v. Becker*, 187 Colo. 344, 531 P.2d 386 (1975).

Here, the prosecution witnesses testified that in August, 1978, the defendant took about $1,500 of ticket receipts from a Jaycees fundraising promotion without authorization from the Jaycees or from the defendant's employer, WRG, and that the money taken was not recovered. The prosecution witnesses explained that the terms of the contract between the Jaycees and WRG and the terms of the defendant's employment specified the manner of reimbursement to the defendant for his services. Moreover, the president of the Jaycees testified that the defendant initially complied with the contract and the terms of his employment.

---

4. The court did not base its ruling on the credibility of the witnesses. *Cf. People ex rel. Van Meveren v. District Court*, 195 Colo. 1, 575 P.2d 405 (1978); *Hunter v. District Court*, 190 Colo. 48, 543 P.2d 1265 (1975).

5. Our reversal of the trial court at this stage of the proceedings is not indicative of our view of the merits of the case against the defendant.

The defendant contends that he was not bound by the terms of the contract. Alternatively, he argues that opening additional accounts and paying himself and his employees from them was authorized by paragraph 3(B) of the contract—which provides that his commissions were to be paid "upon collection and weekly"—and the terms of his employment and was not inconsistent with other provisions of the contract and employment agreement.

The trial court apparently interpreted the contract and agreement to authorize defendant's conduct. Ordinarily the construction of a contract is a question of law for the court, *Radiology Professional Corp. v. Trinidad Health Ass'n*, 195 Colo. 253, 577 P.2d 748 (1978). Where the meaning of the agreement is clear on its face there is nothing to interpret and it must be enforced as written. *Id.; Griffin v. United Bank of Denver*, Colo., 599 P.2d 866 (1979). However, whether or not a contract is ambiguous is also a question of law for the court. *Hahl v. Langfor Construction Corp.*, 529 P.2d 1369 (Colo.App.1974). When the clauses of a contract conflict, it is proper to receive extrinsic evidence to resolve the ambiguity by ascertaining the intent of the parties. *Ryan v. Fitzpatrick Drilling Co.*, 139 Colo. 471, 342 P.2d 1040 (1959).

Our review of the contract persuades us that the conflicts among paragraphs 2(A), 3(A) and 3(B) of the document justified the admission of extrinsic evidence of the manner in which the defendant was to be reimbursed from gross receipts received from ticket sales. While the defendant contends that opening a separate account as a means of collecting his commissions and paying expenses was not inconsistent with paragraphs 2(A) and 3(A), the parties to the contract testified that this conduct was not authorized by paragraphs 2(A) and 3(A) and was inconsistent with paragraph 3(B). Because, as we have stated, conflicting evidence in a preliminary hearing must be resolved against the defendant, *Miller v. District Court, supra*, it was error for the trial court to disregard this evidence of the parties' intent and determine solely from the face of the document that defendant's conduct was authorized. Instead the court should have drawn the inference suggested by the prosecution—that there was sufficient evidence to induce a person of ordinary prudence and caution to a reasonable belief that the defendant obtained and exercised control over the funds in the Western account without authorization from the Jaycees or his principal. Whether, in fact, the contract and employment agreement must be construed to authorize defendant's acts is a matter of defense at trial. *See Johns v. District Court*, 192 Colo. 462, 561 P.2d 1 (1977). The defendant is not entitled to the protection of his interpretation of the contract and employment agreement at this stage of the proceedings.

The same principles dispose of the defendant's contention that, under paragraph 3(B), he was a co—owner of the ticket receipts and could not commit a theft of the funds. *Cf. People v. McCain*, 191 Colo. 229, 552 P.2d 20 (1976). This, too, is a matter for defense at trial.

Finally, the trial court erred when it concluded that the evidence was insufficient to prove specific intent to permanently deprive anyone of the funds in question. Intent may be inferred from the defendant's conduct and the circumstances of the case. *People v. Becker, supra.* Viewed in the light most favorable to the prosecution, *Miller v. District Court, supra*, the evidence warrants a reasonable belief that the defendant possessed the requisite intent.

The judgment of dismissal is reversed and the cause is remanded to the district court with directions to reinstate the information.