Earl WIGGER and Delores Wigger, Plaintiffs–Appellants,

v.

Patrice McKEE, Lamar McLeod, Arapahoe County Sheriff's Department, Ruth Wilder, Arapahoe County Department of Social Services, Arapahoe County Board of Social Services, Board of County Commissioners of Arapahoe County, and Arapahoe County, Defendants–Appellees.

No. 88CA1523.

Colorado Court of Appeals, Div. II.

June 7, 1990.

Rehearing Denied July 5, 1990.

Certiorari Denied April 15, 1991.

Long & Jaudon, P.C., Michael T. McConnell, Elizabeth A. McCarville, Denver, for plaintiffs-appellants.

Wood, Ris & Hames, P.C., Christian M. Lind, Denver, for defendant-appellee Patrice McKee.

Stern & Heiser, James E. Heiser, Denver, for defendants-appellees Lamar McLeod, Arapahoe County Sheriff's Dept., Ruth Wilder, Arapahoe County Dept. of Social Services, Arapahoe County Bd. of Social Services, Board of County Com'rs of Arapahoe County, and Arapahoe County.

Opinion by Judge DAVIDSON.

In this action, based on Earl Wigger's allegedly wrongful prosecution, plaintiffs, Earl and Delores Wigger, appeal the summary judgment granted in favor of defendants, Arapahoe County, the Board of County Commissioners of Arapahoe County, the Arapahoe County Sheriff's Department, the Arapahoe County Department of Social Services, and Lamar McLeod, Ruth Wilder and Patrice McKee, in their official and individual capacities. We affirm.

In the summer of 1985, a Mr. and Mrs. F. engaged Delores Wigger to provide daycare for their three small children, aged 4, 3 and 1, in the Wiggers' home. Because of the nature of his work, Delores' husband, Earl Wigger (Wigger), was often present. On a Saturday afternoon, after Delores had looked after the children for less than three weeks, Mrs. F. noticed that the three- and four-year old girls had reddened genitals. Mrs. F. became concerned, and, as she recalled in a deposition for the present case, she initiated the following exchange: "My goodness, your bottoms are red, has something happened?" When the girls did not

respond, Mrs. F. asked, "Has somebody pulled your panties down?" One or both of the girls nodded. "Who pulled your pants down?" "Jenny's daddy [Mr. Wigger]," responded one of the girls. "Did he pull his pants down, too?" Again, one or both girls indicated, "Yes."

Mrs. F. then tried to contact, among others, Patrice McKee (a social worker with whom she had consulted once before) and the Arapahoe County Department of Social Services. On the advice of the department, she took the children for an immediate physical exam, which indicated no clear evidence of sexual abuse.

Three days later, Lamar McLeod, an investigator with the Arapahoe County Sheriff's Department, and Ruth Wilder, a social worker with the Arapahoe County Department of Social Services, together interviewed each of the girls. The girls independently indicated sexual touching by Wigger but were not terribly communicative. While believing that "something had happened" on the basis of their interviews, McLeod and Wilder thought that further investigation was needed before charges would be warranted.

The following weekend, Patrice McKee also interviewed the girls, who, through the use of both anatomical dolls and speech, independently gave similar reports of sexual fondling by Wigger. Pursuant to § 19–10–104(1) C.R.S. (1986 Repl.Vol. 8B), McKee sent a summary of the interviews to McLeod.

Ultimately, McLeod presented a case filing concerning the complaints against Wigger to the district attorney, who independently decided to prosecute Wigger on two counts of sexual assault on a child. After trial, Wigger was acquitted.

Alleging that Wigger had been wrongfully prosecuted and that, as a result, both he and his wife had suffered extensive economic damages for attorney and investigation fees, loss of earnings and loss of reputation, as well as emotional distress, pain and suffering, and other damages, the Wiggers filed the present civil action. They set forth nine claims for relief, including violation of their Fourth and Fourteenth Amendment rights, enforceable pursuant to 42 U.S.C. § 1983 (1982); malicious prosecution; negligence; outrageous conduct; and defamation.

Concluding that no disputed issues of material fact were presented by the record, the trial court granted summary judgment in favor of defendants on all claims.

## I.

The plaintiffs first contend that the trial court erred in granting summary judgment for all defendants under their claim for damages under 42 U.S.C. § 1983 alleging deprivation of their constitutional rights to be free from prosecution absent probable cause. We disagree.

## A.

As a threshold issue, we must determine whether the recent United States Supreme Court's decision in *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) requires dismissal of the claims brought under 42 U.S.C. § 1983 against any of the government defendants. In *Will*, the Supreme Court held that states are not "persons" under 42 U.S.C. § 1983 and cannot, therefore, be sued under the statute. Here, Arapahoe County, the Board of County Commissioners of Arapahoe County, the Arapahoe County Department of Social Services, the Arapahoe County Sheriff's Department, and Ruth Wilder, Lamar McLeod, and Patrice McKee in their official capacities arguably could be mere arms of the state, in which case the holding in *Will* would deprive the courts of subject matter jurisdiction over them with respect to § 1983 actions. We conclude that *Will* does require the dismissal of the § 1983 claims against the Arapahoe County Department of Social Services and Ruth Wilder and Patrice McKee in their official capacities as employees or consultants to this department, but that it does not affect the others.

The holding in *Will* is premised on the principle of statutory construction there stated that "if Congress intends to alter

the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" That "usual balance" is embodied in the Eleventh Amendment, which provides that the states are immune from suit in federal courts by citizens of the several states or of foreign countries. Because the language of 42 U.S.C. § 1983 does not manifest an intention to disturb the States' Eleventh Amendment immunity, the court concluded that neither a state nor its officials acting in their official capacities are "persons" subject to suit under the statute.

However, the court left intact its previous decision in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* established that "local government units which are not part of the States for Eleventh Amendment purposes" are "persons" under § 1983. Hence, *Will* excludes from § 1983 coverage only the "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Will v. Michigan Department of Social Services, supra.*

■ Whether a governmental entity is an "arm of the state" is determined by balancing the entity's independent powers with those entirely dependent on the state. *See Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ If the entity is the state's alter ego, dependent entirely on the state for the funds and resources to respond to a suit for damages, it is equivalent to the state. *State Highway Commission v. Utah Construction Co.*, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929); *see Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *see also Mt. Healthy City Board of Education v. Doyle, supra; Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

■ On the other hand, counties and municipal corporations that are defined as "bodies corporate and politic" and have even limited power to sue and be sued in their own names are not the state for purposes of the Eleventh Amendment, even though they are political subdivisions of the state. *See Mt. Healthy City Board of Education v. Doyle, supra; Moor v. County of Alameda, supra; Mosier v. Robinson*, 722 F.Supp 555 (W.D.Ark.1989); *see also Will v. Department of State Police, supra* (at time § 1983 was enacted, the term "body politic" was most appropriately applied to a public corporation, which included "towns, cites, and counties, but not states").

■ In Colorado, a county is defined as "a body corporate and politic" and has the power to sue and be sued, to enter into contracts, and to levy certain taxes. Section 30–11–101, C.R.S. (1986 Repl.Vol. 12A). Therefore, it is not the alter ego of the state for Eleventh Amendment purposes and is a "person" under 42 U.S.C. § 1983.

Our supreme court's holdings that a county is a political subdivision of the state and is not a "person" under certain state statutes, *see, e.g., Board of County Commissioners v. Love*, 172 Colo. 121, 470 P.2d 861 (1970), do not affect this result. Such holdings involve neither the Eleventh Amendment nor 42 U.S.C. § 1983, and the United States Supreme Court has noted that it has "consistently refused to construe the Amendment to afford political protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power'." *Lake County Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

■ Therefore, Arapahoe County, sued properly in the name of The Board of County Commissioners of Arapahoe County, *see* § 30–11–105, C.R.S. (1986 Repl.Vol. 12A), is a person under 42 U.S.C. § 1983, and the suit against it may not be dismissed for lack of jurisdiction. *Accord Mosier v. Robinson*, 722 F.Supp. 555 (W.D.Ark.1989).

■ The Arapahoe County Sheriff's Department likewise qualifies as a "person" under the statute. Rather than being appointed by the state, a county sheriff is elected by the citizens of the county in

which he serves. Section 30–10–501, C.R.S. (1986 Repl.Vol. 12A). Rather than being dependent on the state for guidance in conducting his affairs and for funding in case of liability, a county sheriff has many independent duties, *see* §§ 30–10–512 through 30–10–517, C.R.S. (1986 Repl.Vol. 12A), and is himself responsible for posting bond to cover any potential liability that he may incur by virtue of his office. Section 30–10–501, C.R.S. (1986 Repl.Vol. 12A); *see* § 30–10–522, C.R.S. (1986 Repl.Vol. 12A).

■ Whether the Arapahoe County Department of Social Services is a "person" under 42 U.S.C. § 1981 is a separate question. Unlike the statutory provisions relating to counties and county sheriffs, which are included in Title 30, "Government–Counties," those relating to the county departments of social services are set forth in Title 26, the "Colorado Social Services Code." *Cf. Mosier v. Robinson, supra* (statutory scheme in which county functions are separate from state functions supports conclusion that counties are not arms of state). Also, unlike counties and their sheriffs, the county departments of social services have very few powers independent of the state. They are explicitly designated as "agents of the state department" and are charged to administer the public assistance and welfare and related activities in the respective counties "in accordance with the rules and regulations for the state department." Section 26–1–118(1), C.R.S. (1984 Repl.Vol. 11B).

Consistent with this statutory language, our appellate courts have held that the county departments of social services are "functional divisions of the State Department of Social Services for the convenient administration of the state program and are not independent entities separate and distinct from the state." *Nadeau v. Merit System Council*, 36 Colo.App. 362, 545 P.2d 1061 (1975); *see Martin v. District Court*, 191 Colo. 107, 550 P.2d 864 (1976).

In addition, 80% of the overall cost of the assistance programs administered through the county departments is supplied through the state department. *See* § 26–1–122, C.R.S. (1982 Repl.Vol. 11). Because no pro-vision has been made for the county departments to have their own funds to satisfy judgments against them, it appears that they would look to the state treasury for such.

Under this statutory scheme, we conclude that the Arapahoe County Department of Social Services is not a "person" under 42 U.S.C. § 1983 and that the § 1983 claim against it must be dismissed for lack of subject matter jurisdiction. *See McConnell v. Adams*, 829 F.2d 1319 (4th Cir.1987) *cert. denied* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988) (county electoral board is arm of state); *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir.1986) (county adult probation department is arm of state); *but see Holley v. Lavine*, 605 F.2d 638 (2nd Cir.1979) *cert. denied* 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980) and *Mackey v. Stanton*, 586 F.2d 1126 (7th Cir.1978) *cert. denied* 444 U.S. 882, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979) (under New York and Indiana law, county social services departments are not arms of state).

■ Because a suit against an officer of the state in his official capacity is "no different from a suit against the state itself" *Will v. Michigan Department of State Police, supra*, the suit against Ruth Wilder in her official capacity must also be dismissed, as must the suit against Patrice McKee in her official capacity insofar as she was alleged to have been a consultant for the Department of Social Services.

The § 1983 claims against the Board of County Commissioners of Arapahoe County; the Arapahoe County Sheriff's Department; Lamar McLeod, Ruth Wilder, and Patrice McKee in their individual capacities; and those against Lamar McLeod and Patrice McKee in their official capacities as employees of Arapahoe County remain standing.

## B.

Plaintiff's primary contention on appeal against the remaining defendants is that the trial court erred in ruling as a matter of law that probable cause existed to arrest

and prosecute Mr. Wigger, and that, as a result, their § 1983 claim could not be proven. We find no error.

■ To support a claim under 42 U.S.C. § 1983, it is necessary for the plaintiff to prove that the defendant (1) has deprived him of a federal right and (2) that he has done so under color of state or territorial law. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Moreover, even if a constitutional deprivation is shown, there is no liability under the statute unless the defendant caused the deprivation. *Hand v. Gary*, 838 F.2d 1420 (5th Cir.1988).

To satisfy the first prong of the test, the plaintiffs here rely on their allegation that the defendants caused the denial of Wigger's constitutional rights under the Fourth and Fourteenth Amendments to be free from arrest and prosecution absent probable cause.

■ In a § 1983 damage suit, the existence of probable cause, when dependent on the resolution of factual questions, is for the determination of the jury. *Deary v. Three Un-named Police Officers*, 746 F.2d 185 (3rd Cir.1984). However, if no genuine issue as to any material fact exists and if credibility conflicts are absent, the determination may be made on summary judgment as a matter of law. *Scott v. Donovan*, 539 F.Supp. 255 (N.D.Ga.1982).

■ The standard controlling a probable cause determination is whether the evidence is sufficient to induce a person of ordinary prudence and caution reasonably to believe that the defendant committed the crime charged. *People v. Taylor*, 655 P.2d 382 (Colo.1982). A judicial finding of probable cause under this standard after a preliminary hearing is prima facie evidence of probable cause to prosecute, which evidence may be rebutted by proof that the defendant misrepresented, withheld or falsified evidence at the hearing. *White v. Frank*, 855 F.2d 956 (2d Cir.1988); *see Stainer v. San Luis Valley Land & Mining Co.*, 166 F. 220 ((8th Cir.1908).

■ Further, to defeat a judicial finding of probable cause, any actions or omissions by the defendant must have tainted the proceedings. *Hand v. Gary, supra; see Rose v. Bartle*, 871 F.2d 331 (3rd Cir. 1989) (probable cause finding must have been "procured" by defendant's acts); Restatement (Second) of Torts § 663, comment h (1977) (court should take account of any withholding of *material* evidence).

Hence, if probable cause exists as a matter of law irrespective of whether the § 1983 defendants acted with due care or produced certain information, it cannot be concluded that defendants' negligence or failure to disclose the information in the preliminary hearing deprived the plaintiffs of a constitutional right.

■ Here, plaintiffs assert that the probable cause determination at preliminary hearing and the consequent binding over of Wigger to trial were tainted by various acts and omissions of the several defendants.

Specifically, they point to the failure of the defendants, excluding McKee, to divulge before or during the preliminary hearing the following information which was part of the county Social Services Department file: The parents' expressed concern that, by asking leading questions, they may have "put words in the girls mouths"; a description of the "unusual manner" in which the girls' mother questioned them; the parents' report that the girls were "flipping around" on their stories in the few days after the initial questioning session; the statement by an unnamed emergency room nurse who examined the girls that the only detectable redness on their genitalia was more readily attributable to "taking too many bubble baths" than to sexual assault; and McLeod's determination after his initial interview with the girls that at that time there was insufficient evidence to establish probable cause. In addition, the plaintiffs assert that the county defendants and McLeod, Wilder, and McKee were incompetent in their interviewing and/or investigatory techniques and that a jury could have found that the techniques tainted the probable cause finding. We disagree that any of these factors rais-

es disputed issues of fact here so as to defeat a summary judgment motion.

We first reject plaintiff's assertion that any failure by the defendants to disclose the information noted so tainted the probable cause finding that the inclusion of the information could have brought about a different result.

First, we note that although the statements cited by plaintiffs were not included in the case filing submitted by McLeod to the district attorney, equivalent information was: The report states that the victims' mother "questioned both girls"; that one answered "yes and no when [the mother] asked if Earl Wigger had ever pulled her pants down"; that the same one answered both yes and no when Wilder later asked if Wigger had ever touched her; that the emergency room diagnosis was that one child's genital area was normal and that the other's had some redness "caused by some unknown irritation."

Also, although the case filing failed to mention McLeod's determination after the first interview that there was, at that time, insufficient evidence to establish probable cause, this first impression was irrelevant to the final submission after further investigation. Even at that early stage, both McLeod and Wilder felt that "something had happened."

In addition, as stated by the trial court, there was a significant amount of consistent evidence in the record indicating that the sexual assaults had occurred.

When questioned together by their mother, each girl indicated that improper behavior had occurred, with one girl volunteering that the perpetrator was Wigger. Further interviews of each child individually by McLeod, Wilder, McKee, and by one child's own therapist resulted in specific and age appropriate descriptions by the girls of sexual fondling by Wigger. The limited leading questions asked by the mother, although consistent therewith, did not set up the detail and consistency of the subsequent independent reports.

Furthermore, a number of deponents, including Wigger's two defense attorneys, have testified that in their opinions the prosecution had sufficient evidence to establish probable cause. None has stated that his opinion would be different had the statements omitted from the case filing been included. None has suggested that any of the defendants withheld information intentionally, recklessly, or in bad faith.

 We also reject plaintiffs' claim that disputed issues of material fact exist as to whether McLeod's, Wilder's, McKee's, or the county's investigatory and/or interview techniques tainted the probable cause finding.

Plaintiffs allege the finding was tainted because of the following failures of McLeod and Wilder. In spite of access to knowledge that the girls' mother had asked them leading questions about the incident, Wilder and McLeod did not interview the mother to find out exactly what she had said. Nor did they question McKee on whether she had attempted to rule out suggestion before she submitted her report to the sheriff in which she gave her professional opinion that sexual assault had occurred. No attempt was made to investigate whether the girls had been exposed to materials of a sexual nature in their home, which, in fact, turned out to display *Playboy* on the coffee table. Finally, contrary to standard procedures, Wilder and McLeod did not submit the case for review by the county multi-disciplinary child protection team, which may make recommendations as to treatment and evaluation of abused children. Section 19-10-109(6), C.R.S. (1985 Repl.Vol. 8B) (as then in effect).

Similarly, the plaintiffs assert that McKee, who knew that her evaluation would be used by law enforcement officers, negligently and recklessly interviewed the children without taking notes, without specifying whether her opinion that Wigger had sexually assaulted the girls was based on verbal or non-verbal communication, and without inquiring as to whether they had been coached. She then sent a letter to McLeod which also did not explain the basis for her opinion, other than that the girls so "reported."

While we do not discount that leading questions and other investigatory flaws can taint a probable cause finding, we disagree with plaintiffs that reasonable minds could differ as to whether such taint could be found under the circumstances of this case. As we have already stated, the mother's leading questions that McLeod and Wilder failed to pursue here did not involve the kind of detail that could have discredited the detailed, independent reports of the girls. Nor is there evidence that the investigators themselves or anyone other than the mother, whose questions we have already discussed, suggested to the girls how they should respond.

In addition, while we do not condone the failure of McLeod and Wilder to investigate the case more thoroughly or the failure of McKee to explain the girls' "reports," we nevertheless conclude that the remaining gaps described by plaintiffs here also do not negate probable cause. Rather, they affect the weight the jury may give the investigators' reports at the criminal trial. *See People v. Johnson*, 618 P.2d 262 (Colo. 1980).

Under these circumstances, we agree with the trial court that no reasonable jury could conclude that probable cause did not exist, with or without the withheld material or additional investigation. *See Easton v. Boulder*, 776 F.2d 1441 (10th Cir.1985) *cert. denied* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *Lee v. City of Mt. Vernon*, 49 N.Y.2d 1041, 429 N.Y.S.2d 557, 407 N.E.2d 404 (1980); *cf. Goodwin v. Metts*, 885 F.2d 157 (4th Cir.1989) (jury could reasonably find that the investigating officer's failure to inform the prosecutor that someone else had confessed to the crime could have affected the decision to prosecute). Hence, as a matter of law, the withholding and limited investigation neither tainted the probable cause determination nor deprived Wigger of a constitutional right, *see Hand v. Gary, supra*, and we, therefore, affirm the summary judgment with respect to plaintiffs' claim under 42 U.S.C. § 1983.

## II.

■ The plaintiffs next contend that the trial court erred in granting summary judgment for the defendants on their claim of malicious prosecution. However, a cause of action for malicious prosecution requires proof that the plaintiff was prosecuted without probable cause. *Montgomery Ward & Co. v. Pherson*, 129 Colo. 502, 272 P.2d 643 (1954). Because we have already determined that probable cause to prosecute existed irrespective of defendant's action or nonaction, summary judgment on the malicious prosecution claim was proper.

## III.

Next, the plaintiffs assert that the trial court erred in granting summary judgment on its claims of negligence accompanied by bad faith and outrageous conduct.

■ Negligence occurs when one party deviates from reasonable standards of care owed to another, and such conduct naturally and foreseeably results in injury to the other. *Fagerberg v. Webb*, 678 P.2d 544 (Colo.App.1983), *modified on other grounds sub nom. Webb v. Dessert Seed Co.*, 718 P.2d 1057 (Colo.1986). Negligence is actionable only when it results in injury to the complaining party. *Manemann v. United States*, 381 F.2d 704 (10th Cir.1967); *Block v. Balajty*, 31 Colo.App. 237, 502 P.2d 1117 (1972).

■ Here, even if we assume the defendants acted negligently, the only evidence of injury to the plaintiffs is that naturally resulting from Wigger's allegedly wrongful prosecution. There is no allegation or evidence that defendants negligently caused plaintiffs any injury that was either independent of the prosecution or not a natural result thereof.

We have already determined that Wigger's prosecution was not pursued without probable cause and are aware of no authority suggesting that the circumstances associated with a prosecution based on probable cause are a legally cognizable injury. Therefore, the summary judgment on the negligence claims was proper.

Because plaintiffs' emotional distress was the direct result of the prosecution generally, rather than from any particular outrageous acts of the defendants, summary judgment was likewise appropriate on the claims of outrageous conduct. *See Espinosa v. Sheridan United Tire,* 655 P.2d 424 (Colo.App.1982) (no recovery unless defendant's conduct caused severe emotional distress).

IV.

Finally, plaintiffs allege error in the trial court's grant of summary judgment on their claims that defendants defamed Wigger by publishing written and verbal statements that Wigger had sexually mistreated the two young girls. Again, we disagree.

The allegedly defamatory statements made here are protected by two privileges: The statutory privilege set out in § 19–10–110, C.R.S. (1986 Repl.Vol. 8B), as then in effect; and a common law, qualified privilege for those making communications in which they have an interest or duty. *See Ling v. Whittemore,* 140 Colo. 247, 343 P.2d 1048 (1959).

Section 19–10–110 protects from liability any person "participating in good faith in the making of a report or in a judicial proceeding held pursuant to" the Children's Code. The statute sets forth a rebuttable presumption of good faith. *See Martin v. County of Weld,* 43 Colo.App. 59, 598 P.2d 532 (1979).

Similarly, unless malice is shown, the common law privilege protects a person from liability for defamation for any communication "made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty ... if made to a person having a corresponding interest or duty, although it contains incriminating matter, which, without this privilege, would be slanderous and actionable." *Ling v. Whittemore, supra, quoting Bereman v. Power Publishing Co.,* 93 Colo. 581, 27 P.2d 749 (1933).

Except for weighing any disputed issues of fact as to malice, the determination of whether the common law privilege may be applied is a matter of law for the court. And, as with the statutory privilege, the presence of good faith and the absence of malice are presumed. *Ling v. Whittemore, supra.*

Here, the record indicates that plaintiffs have alleged defamation in the interview, case filing, and trial reports by McLeod, Wilder, and McKee and in a statement by McKee to another therapist to whom she referred one of the girls for counseling.

In the absence of bad faith, the former reports are protected by § 19–10–110 and the latter by the common law privilege.

Like the trial court, we have found no evidence in the record to rebut the presumption of good faith. While all the defendants submitted personal depositions explaining their interviewing and reporting methods in general and in this case specifically, and McKee submitted experts' depositions attesting to her care and good faith, plaintiffs presented no facts from which it can be inferred that the defendants acted with malice. With no disputed material facts, summary judgment on the defamation claim was also not in error.

Judgment affirmed.

HUME, J., concurs.

TURSI, J., specially concurs.

Judge TURSI specially concurring:

Because I agree that the judgment of the trial court in this matter is correct, I concur in the result. However, because I am unpersuaded that Colorado counties are municipalities subject to liability under 42 U.S.C. § 1983 (1982), I write separately.

The resolution of this issue requires a reconciliation of *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Monell* reversed the holding in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) which had held that municipalities are not persons under § 1983.

In reversing *Monroe*, the *Monell* court relied upon the legislative histories surrounding the rejection by Congress of the "Sherman Amendment" to the Bill which became the Civil Rights Act of 1871, 17 Stat. 13, the precursor of § 1983. Quoting from the legislative debates, Justice Brennan cites Representative Shellabarger, the principal sponsor of the Act and a supporter of the "Sherman Amendment" as saying that the only serious question remaining was "whether, since a county is an integer or part of a State, the United States can impose upon it, as such, *any obligation to keep the peace* in obedience to United States laws." (emphasis in original) Further into the debates, Justice Brennan quotes from Representative Burchard, who in agreement with Representative Poland, stated that "there is no duty imposed by the Constitution of the United States, or usually by State laws, upon a county to protect the people of that county against the commission of the offenses herein enumerated.... Police powers are not conferred upon counties as corporations; they are conferred upon cities that have qualified legislative power." Justice Brennan then emphasized that by the latter part of the nineteenth century municipalities in the nature of cities and towns were no longer covered by the umbrella of sovereign immunity. Thus, the clear implication is that cities and towns were not clothed with the sovereign immunity of states and counties.

In *Will*, Justice White, writing for the majority stated "we consequently limited our holding in *Monell* to 'local government units which are not considered part of the State for Eleventh Amendment purposes.'.... Conversely, our holding here does not cast any doubt on *Monell*, and applies only to states or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes."

There is authority, generally in the form of dicta, which, when addressing the question of diversity under 28 U.S.C. § 1331, has held that a county may be treated as a municipality. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). However, those decisions also refer to the organic law of the state involved to determine whether a political subdivision is a municipality for purposes of suit.

A review of pertinent Colorado authority, in the latter part of the nineteenth century and to date, convinces me that we have not equated counties with traditional municipal corporations. For example, in *Stermer v. Board of County Commissioners*, 5 Colo. App. 379, 38 P. 839 (1894), it was held that a county is a quasi-corporation in contradistinction to a municipal corporation and that the distinction between the two classes of public corporation is very clearly drawn. Citing 1 Dill.Mun.Corp. §§ 19, 22, the court held that "a municipal corporation, in its strict and proper sense, is a body politic and corporate, constituted by the incorporation of the inhabitants of the city or town for the purposes of local government thereof." The court then went on to say:

> "[T]he difference between this class of corporations and counties is fundamental and evident. A county is created by the legislature without reference to the will of its inhabitants. It has no power of local government, or independent authority of any kind whatever. Its officers, although elected by its people, are virtually officers of the state, and are charged with the administration and execution of the laws of the state. It is merely a subdivision of the state for the purposes of state government."

Further, in *Board of County Commissioners v. Wheeler*, 39 Colo. 207, 89 P. 50 (1907), the court held that:

> "[C]ounties, unlike private or purely municipal corporations, are not voluntary bodies corporate. They are involuntary, political, or civil divisions of the state, created by general laws to aid in the administration of the government. They are purely auxiliaries of the state and to the general statutes of the state they owe their creation, and the statutes confer upon them all the powers they possess, prescribe the duties they owe, and impose the liabilities to which they are subject."

And, in *McFerson v. Board of County Commissioners*, 78 Colo. 354, 241 P. 733 (1925) the court held that although the term municipal corporation was sometimes used in statutes to include counties, a county was not strictly speaking a municipal corporation and was, therefore, not subject to garnishment under the statute authorizing garnishment against municipal corporations.

Further, at the time of the passage of § 1983, the common law tort liability of municipal corporations generally had not been extended to counties such as those created in Colorado. *See Abeyta v. Denver*, 165 Colo. 58, 437 P.2d 67 (1968); *M & M Oil Transportation, Inc. v. Board of County Commissioners*, 143 Colo. 309, 353 P.2d 613 (1960); *Fairplay v. Board of County Commissioners*, 29 Colo. 57, 67 P. 152 (1901).

For the continuing efficacy of this rule, *see Johnson v. Jefferson County Board of Health*, 662 P.2d 463 (Colo.1983) quoting from *Board of County Commissioners v. Love*, 172 Colo. 121, 470 P.2d 861 (1970), in which the court stated:

> "A county is not an independent governmental entity existing by reason of any inherent sovereign authority of its residents; rather, it is a political subdivision of the state, existing only for the convenient administration of the state government, created to carry out the will of the state.... As a political subdivision, a county, and its commissioners, possess only such powers as are expressly conferred upon them by the constitution and statutes, and such incidental implied powers as are reasonably necessary to carry out such express powers."

Therefore, since it is unnecessary to the disposition of this case, I would not extend *Monell* to Colorado counties.