Yale A. FISHER, Plaintiff–Appellant,

v.

COMMUNITY BANKS OF COLORADO,
INC., Defendant–Appellee.

No. 09CA0162.

Colorado Court of Appeals,
Div. VII.

Sept. 2, 2010.

Rehearing Denied Oct. 7, 2010.

Polsinelli Shughart, PC, Bennett L. Cohen, Philip W. Bledsoe, Denver, Colorado, for Plaintiff–Appellant.

Moye White LLP, James R. Miller, Paul R. Wood, Jake E. Matter, Thomas H. Wagner, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge CONNELLY.

Plaintiff, Yale A. Fisher (borrower), appeals from a judgment entered after a jury trial in a lender liability case brought against defendant, Community Banks of Colorado, Inc. (bank). The jury, following legal and evidentiary rulings adverse to borrower, rejected borrower's claims and found in favor of bank on a counterclaim.

The most significant appellate issues involve Colorado's Credit Agreement Act, § 38–10–124, C.R.S.2009. The so-called statute of frauds in that Act is an expansive one: it not only operates like a typical statute of frauds to require that covered credit agreements be in writing, but also severely limits the evidence and claims allowable in actions relating to such written agreements. We hold, however, that the Act does not limit extrinsic evidence to resolve facially ambiguous credit agreements. We further hold that the agreement here was ambiguous because it contained inconsistent provisions regarding the interest due upon borrower's default.

We accordingly reverse and remand for a new trial on borrower's claims against bank. We also reverse the counterclaim judgment against borrower because bank unequivocally assigned that claim to a third party.

## I. Background

### A. The Loan, Change Agreements, and Default

Bank loaned borrower some $3.4 million to build a luxury home in Cherry Hills Village. As security, borrower executed deeds of trust to that land and to his Telluride vacation home.

The loan was modified and extended three times, through documents entitled "CHANGE IN TERMS AGREEMENT." Each change agreement contained a "DESCRIPTION OF CHANGE IN TERMS"

paragraph that listed changed terms and ended by stating, "All other terms and conditions remain the same."

The second change agreement is the one that spawned the later dispute leading to this litigation. The paragraph describing the changed terms extended the loan term by three months and altered the standard interest rate to two percent over prime with a six percent floor. It ended by stating, "All other terms and conditions remain the same." Several paragraphs later, however, this agreement purported to make an additional change. It stated that bank, "at its option, may, if permitted under applicable law, increase the variable interest rate on this Agreement to 36.000% per annum."

After a third change agreement extending the loan term and changing the standard interest rate to a fixed six percent, borrower defaulted on the loan. Bank, using the standard six percent interest rate, demanded that borrower repay the then $3.5 million principal plus some $180,000 in accrued interest and penalties. Bank ultimately initiated foreclosure proceedings.

Bank sold the loan to Western Real Estate Equities, LLC. It told Western there was a special thirty-six percent default interest rate. After purchasing the loan, Western demanded that borrower repay the $3.5 million principal together with more than $2 million in interest calculated at this higher rate.

Bank provided Western with an affidavit stating, inaccurately, that the thirty-six percent rate had been "heavily negotiated." Borrower and Western reached a settlement whereby borrower paid some $4.5 million under the note and relinquished any claims against Western but not against bank.

### B. Trial Court Litigation

Borrower then sued bank in this state court action. Though he asserted a variety of causes of action, his present appeal involves only contract-based and fraud claims.

Borrower contended that bank breached the contract and committed fraud regarding the default interest rate. He maintained the parties never intended a thirty-six percent interest rate, and he also challenged other aspects of the bank's post-default actions. Bank counterclaimed that borrower had fraudulently induced it to make the loan.

The case proceeded to a jury trial. The trial court ruled as a matter of law that the change agreements established a default interest rate of thirty-six percent. It excluded much of borrower's proposed evidence of prior and contemporaneous statements suggesting the parties did not intend this rate, ruling that this evidence was barred by Colorado's Credit Agreement Act. And it instructed the jury that borrower had read the agreements and understood that there was a thirty-six percent default interest rate.

The trial court's rulings precluded borrower from establishing his fraud and misrepresentation claims. Borrower dismissed those claims. The case went to the jury on borrower's civil conspiracy claim and his contract-based claims alleging that bank had violated principles of good faith and fair dealing. Bank's fraudulent inducement counterclaim also went to the jury.

The jury ruled in bank's favor on borrower's claim and on the fraudulent inducement counterclaim; it awarded bank $96,680 in damages. After adding statutory interest, the court entered judgment against borrower for some $136,000.

### II. Analysis
#### A. The Loan Agreements and the Credit Agreement Act

Borrower contends that the trial court was incorrect in ruling that (1) the loan agreements unambiguously set a thirty-six percent default interest rate and (2) the Credit Agreement Act precluded evidence that the parties never intended that rate. We review both contentions de novo. *See East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo.2005) (ambiguity of contract); *Wolf Ranch, LLC v. City of Colorado Springs*, 220 P.3d 559, 563 (Colo. 2009) (statutory interpretation).

##### 1. Conflicting clauses render the loan agreements ambiguous regarding the default interest rate.

Ambiguity is established where "the clauses of a contract conflict." *People v.*

*Johnson,* 618 P.2d 262, 266 (Colo.1980); *accord Bennett v. Price,* 692 P.2d 1138, 1139 (Colo.App.1984). That is precisely the case here.

■ The original loan agreement and three change agreements, which incorporated each other, must be construed together. *See Premier Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 517 (Colo.App.2006). There was no thirty-six percent default interest rate in the original agreement or first change agreement. Bank contends the second change agreement changed the default interest rate to thirty-six percent. This contention, however, contradicts the second change agreement's paragraph that expressly detailed the changes from prior agreements, made no mention of any increased default interest rate, and stated that "[a]ll other terms and conditions remain[ed] the same."

There was no separate default interest rate provision in the original loan agreement. The first change agreement added a default interest paragraph stating that, upon default, the sum due would bear interest "at the variable interest rate of this Agreement." Though this new paragraph was not mentioned in the description of changes paragraph, it did not effectuate any operational change because the rate was set at the note rate. The standard interest rate ultimately was established, in the third change agreement, as a fixed six percent.

The special default interest rate, of thirty-six percent, first appeared in the second change agreement. The paragraph setting this special rate came several paragraphs after the description of changes paragraph referencing a specific change, making no mention of a special default rate, and stating that "[a]ll other terms and conditions remain the same."

The second change agreement contains irreconcilable provisions regarding a default interest rate. One paragraph states that there is no change to prior agreements other than as set forth in the paragraph. But, contrary to this paragraph, a later paragraph purports to change the default interest rate. The second change agreement thus is inter-

nally contradictory and ambiguous on whether the default interest rate was changed.

We reject bank's contention that ambiguity in the second change agreement somehow vanishes as a result of the third change agreement. Bank contends that because a thirty-six percent rate was established in the second change agreement, the third change agreement accurately stated that there were no other changes from prior agreements. But this begs the issue of whether the rate was ever validly changed to thirty-six percent.

### 2. The Credit Agreement Act does not preclude extrinsic evidence to resolve a facially ambiguous agreement.

■■ The general rule is that "[w]hen the clauses of a contract conflict, it is proper to receive extrinsic evidence to resolve the ambiguity by ascertaining the intent of the parties." *Johnson,* 618 P.2d at 266 (citing *Ryan v. Fitzpatrick Drilling Co.,* 139 Colo. 471, 342 P.2d 1040 (1959)). Extrinsic evidence is that "surrounding the formation of the contract," such as any "oral negotiations." *Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 912 (Colo. 1996). The ultimate meaning of an ambiguous provision is a question of fact. *Id.*

■ The trial court ruled the Credit Agreement Act precluded borrower's evidence that the parties never intended a thirty-six percent rate. The excluded evidence included (1) a handwritten statement on an official loan committee document that all prior terms and conditions (other than a slight change to the standard interest rate) "remain unchanged" by the second change agreement, (2) a bank official's deposition testimony that this statement was meant to signal "the only change" intended, and (3) evidence that the thirty-six percent default rate was inserted automatically by new bank software without the loan officer's knowledge.

The trial court's exclusionary rulings rested on the premise that the second and third change agreements unambiguously set a thirty-six percent default interest rate. Because this premise was erroneous, the rulings cannot stand.

The Act's statute of frauds is extremely broad. It precludes a debtor's or creditor's "claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought." § 38–10–124(2).

■ The Act's breadth has two main sources. First, a "credit agreement" includes not only the agreement itself, but also any modifications thereto and "[a]ny representations and warranties made or omissions in connection" therewith. § 38–10–124(1)(a)(I)–(III), C.R.S.2009; *see Pima Fin. Service Corp. v. Selby,* 820 P.2d 1124, 1127 (Colo.App.1991). Second, the Act covers "claims which merely relate to credit agreements." *Schoen v. Morris,* 15 P.3d 1094, 1097 (Colo.2000) (internal quotations omitted). It thus precludes claims, including fraudulent inducement claims based on oral misrepresentations, that a "general statute of frauds" would not bar. *Premier Farm Credit,* 155 P.3d at 515.

■ We hold, however, that the Act does not preclude relevant extrinsic evidence offered to resolve the intended meaning of a facially ambiguous credit agreement. We note that a Missouri appeals court has held likewise under that state's credit agreement statute of frauds. *See Block v. North American Savings Bank,* 59 S.W.3d 567, 573–74 & n. 3 (Mo.Ct.App.2001).

■ The Act's "central purpose" is "promoting certainty in credit agreements by 'curtail[ing]' suits against lenders based on oral representations made by members of the credit industry.' " *Premier Farm Credit,* 155 P.3d at 514 (quoting *Schoen,* 15 P.3d at 1098–99). Courts are required to construe a statute in a way that "best effectuates" its "purposes." *Smith v. Executive Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010). Accordingly, Colorado courts have disallowed claims that "would introduce uncertainty into credit agreements." *Premier Farm Credit,* 155 P.3d at 515.

A facially ambiguous credit agreement, however, such as the loan and change agreements here, defies certainty. Extrinsic evidence is the normal means of ascertaining what the parties intended in such cases. *See Johnson,* 618 P.2d at 266.

An alternative to extrinsic evidence might be to apply canons of contract interpretation. But this is not a satisfactory alternative because "for any given maxim" supporting one side, there is often "a contrary maxim" supporting the other. Edwin W. Patterson, *The Interpretation and Construction of Contracts,* 64 Colum. L.Rev. 833, 852 (1964); *cf. Landgraf v. USI Film Prods.,* 511 U.S. 244, 263, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("As Professor Llewellyn famously illustrated, many of the traditional canons [of statutory construction] have equal opposites.") (citing Karl Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes are to be Construed,* 3 Vand. L.Rev. 395 (1950)).

Our case illustrates how such canons can point in opposite directions. Bank, in arguing that the paragraph changing the default interest rate should control over the paragraph stating that prior terms remained the same, invokes the canon that "specific clauses of a contract control the effect of general clauses." *Holland v. Board of County Commissioners,* 883 P.2d 500, 505 (Colo.App.1994); *see* Restatement (Second) of Contracts § 203(c) (1981). Even if bank is correct as to which paragraph is specific and which is general, borrower invokes a competing canon (*contra proferentem* ) that "all ambiguities should be strictly construed against the party drafting the contract." *Elliott v. Joyce,* 889 P.2d 43, 46 (Colo.1994); *see* Restatement (Second) of Contracts § 206 (1981).

■ These interpretive canons, whatever their utility, are only "secondary" guides to help "determine the meaning of those words or clauses whose meaning remains unclear or ambiguous after and despite the application of the primary rules" of interpretation. 11 Richard A. Lord, *Williston on Contracts* § 32:1, at 390–91 (4th ed.1999). In contrast, at least where a contract is ambiguous, extrinsic evidence of "the circumstances surrounding the execution of a contract" is one of the "primary" means of

ascertaining the parties' intent. *Id.* § 32:7, at 434–39. Thus, the specific-versus-general canon invoked by bank is a mere "aid" that does not "override evidence of the [intended] meaning of the parties." Restatement (Second) of Contracts § 203 cmt. a (1981); *see also id.* cmt. e ("the rule yields to manifestation of a contrary intention"). Likewise, the *contra proferentem* canon invoked by borrower applies only where there is "no extrinsic evidence that would illuminate the parties' intent." *Miller v. Monumental Life Ins. Co.,* 502 F.3d 1245, 1253–54 (10th Cir.2007).

In cases involving facially ambiguous contract provisions, therefore, extrinsic evidence is a primary means of ascertaining the parties' intended meaning. There is no indication the General Assembly intended the Act to preclude evidence necessary to ascertain the meaning of facially ambiguous credit agreements. Construing the Act to preclude evidence necessary to ascertain the meaning of a facially ambiguous credit agreement not only would not further the Act's purpose of "promoting certainty in credit agreements," *Premier Farm Credit,* 155 P.3d at 514, but would lead to an absurd result serving the ultimate interests of neither banks nor borrowers. We must avoid such an absurd result. *See Smith v. Executive Custom Homes,* 230 P.3d at 1189.

Accordingly, we hold that the Credit Agreement Act does not preclude extrinsic evidence relevant to resolving the ambiguity of the intended default interest rate. Borrower is entitled to a new trial in which the jury considers otherwise admissible extrinsic evidence relevant to resolving the agreements' ambiguity. It will be for the properly instructed jury, *see, e.g.,* CJI–Civ. 30:14 (2010), to determine which interest rate the parties intended to control upon default.

### B. Remaining Issues on Borrower's Claims

We cannot anticipate every issue that may arise on remand. But we do note one other error in the trial court's application of the Credit Agreement Act. The court applied the Act to exclude not only oral representations but also written bank documents. The Act, however, does not preclude evidence that is

itself "in writing and signed by the party against whom enforcement is sought." § 38–10–124(2); *see, e.g., PayoutOne v. Coral Mortgage Bankers,* 602 F.Supp.2d 1219, 1225–26 (D.Colo.2009).

Bank alternatively argues that borrower's claims are barred by (1) claim preclusion and (2) the economic loss rule. The trial court rejected the first argument and never reached the second.

■■■■■ We decline to address bank's claim preclusion argument. Bank's appellate brief lacks any meaningful argument of this point but instead simply "requests [that] this court review" the (more than 300 pages of) briefs and exhibits filed on this issue in the district court. A party's incorporation by reference of prior pleadings is improper because it shifts to the appellate court "the task of locating and synthesizing the relevant facts and arguments." *Castillo v. Koppes–Conway,* 148 P.3d 289, 291 (Colo.App.2006); *see also People v. Wallin,* 167 P.3d 183, 187 (Colo.App.2007) (appellate courts will not consider perfunctory arguments).

We also decline to consider bank's argument that borrower's tort claims are precluded by the economic loss rule. It is true that, "[o]n appeal, a party may defend the trial court's judgment on any ground supported by the record, whether relied upon or even considered by the trial court." *People v. Aarness,* 150 P.3d 1271, 1277 (Colo.2006). But given that borrower has contract claims not precluded by the economic loss rule, the economic loss rule cannot result in our upholding the judgment. Those arguments are best left for the trial court's consideration in the first instance as it decides how the interrelated claims should be submitted to the jury.

### C. Bank's Counterclaim

■■■■■ Borrower contends that bank lacked standing to maintain a fraudulent inducement counterclaim because it assigned the loan and all related claims to Western. We review de novo questions of law involving a plaintiff's standing. *Barber v. Ritter,* 196 P.3d 238, 245 (Colo.2008). Standing here turns on an issue of contract construction

reviewed de novo. *See Copper Mountain, Inc. v. Industrial Systems, Inc.,* 208 P.3d 692, 697 (Colo.2009).

The Bill of Sale in this case was drafted broadly. Bank sold Western "all of its right, title and interest in the Loan," "including, but not being limited to, any and all claims and causes of action of [bank], whether known or unknown, against any person or entity liable under the Loan, which is in any way based upon, arising out of, or is related to the said Loan or Loan Documents."

The plain language shows that bank assigned to Western any claim that borrower fraudulently induced bank to enter the loan; such a claim plainly is one "related to the said Loan." *See Premier Farm Credit,* 155 P.3d at 515. Bank's contention that it was "unaware" of facts supporting such a claim is unavailing, given that the Bill of Sale expressly covered "known or unknown" claims.

In arguing that the fraudulent inducement claim was not assigned to Western, bank relies (as did the trial court) on *Ford v. Summertree Lane Limited Liability Co.,* 56 P.3d 1206 (Colo.App.2002). This reliance is misplaced, as *Ford* is distinguishable. The issue there was whether a "general warranty deed" conveyed not just the specified real property but also pre-existing tort claims related to that property. The division, stressing the legal distinction between conveyances of realty and personalty, held that it did not. *Id.* at 1209–10. It explained that "the warranty deed contains only traditional language used to convey real property" and evidenced no intent to convey "choses in action lying in tort." *Id.* at 1210.

Here, in contrast to *Ford,* the relevant document is not a general warranty deed but a commercial contract. That contract, moreover, expressly transferred not just the loan itself but "any and all claims and causes of action … related [there]to." The contract plainly transferred bank's tort claims related to the loan.

---

\* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

### III. Conclusion

The judgment is reversed, and the case is remanded for a new trial on borrower's claims and for dismissal of bank's counterclaim.

Judge LICHTENSTEIN and Judge KAPELKE \* concur.