Kayanna **PIERCE**, a deceased minor, by and through her father and next friend Victor J. Pierce, and Victor J. Pierce, Jacob Pierce, and Jered Pierce, individually, Plaintiffs,

v.

**DELTA COUNTY DEPARTMENT OF SOCIAL SERVICES**, Colorado State Department of Human Services, Delta County Sheriff's Department, Delta Police Department, the City of Delta, Mike Worthington, Susan Worthington, Annette Ornelas, Susan Blaine, Paul Suppes, William Lemoine, John Gore, Travis Anderson, Royce Spiker, Donna Littlefield, and John and Jane Does 1–20, Defendants.

Civil Action No. 00 N 12.

United States District Court, D. Colorado.

Oct. 20, 2000.

Daniel Mark Genet, Joseph D. Bloch, Joseph D. Bloch & Associates, Denver, CO, for plaintiffs.

Theodore Samuel Halaby, Douglas Todd Cohen, Halaby, Cross & Schluter Denver, CO, for Delta County Department of Social Services, Delta County Sheriff's Department, William Lemoine.

William V. Allen, Attorney General's Office, Denver, CO, for Colorado State Department of Human Services.

Earl G. Rhodes, Michael Paul Forrest, Younge & Hockensmith, P.C., Grand Junction, CO, for the City of Delta.

Theodore Samuel Halaby, Douglas Todd Cohen, Halaby, Cross & Schluter Denver, CO, William V. Allen, Attorney General's Office, Denver, CO, for Colorado State Department of Human Services, for Mike Worthington, Susan Worthington, Annette Ornelas, Susan Blaine.

Earl G. Rhodes, Michael Paul Forrest, Younge & Hockensmith, P.C., Grand Junction, CO, Theodore Samuel Halaby, Halaby, Cross & Schluter Denver, CO, for Paul Suppes, John Gore.

Marc F. Colin, Robert Stephen Hall, Bruno, Bruno & Colin, P.C. Denver, CO, Earl G. Rhodes, Michael Paul Forrest, Younge & Hockensmith, P.C., Grand Junction, CO, for Travis Anderson, Royce Spiker.

Thomas N. Alfrey, Carol Lynn Thomson, Nicolle Herian Martin, Treece, Alfrey, Musat & Bosworth, P.C., Denver, CO, for Donna Littlefield.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is a civil-rights action. On January 4, 1999, two-year-old Kayanna Pierce died from injuries allegedly inflicted by her mother's live-in boyfriend, Jeremiah Duran. Plaintiffs Victor J. Pierce, Jacob Pierce, and Jered Pierce, Kayanna's father

and brothers respectively, allege that Defendants Delta County Department of Social Services ("Delta Social Services") and its employees Annette Ornelas, Susan Blaine, and William Lemoine, Delta County Sheriff William Blair and Deputy Sheriff Mike Worthington, City of Delta ("City"), Delta Police Department, Delta Police Chief Paul Suppes and Delta Police Officers Sergeant John Gore, Travis Anderson, and Royce Spiker, and licensed social worker Donna Littlefield violated their rights and Kayanna's rights under the Fourteenth Amendment to the United States Constitution.[1] Plaintiffs seek relief under 42 U.S.C.A. § 1983 (West 1994 & Supp.2000) [hereinafter "section 1983"], 42 U.S.C.A. § 1985 (West 1994) [hereinafter "section 1985"], and Colorado state law. This matter is before the court on: (1) "Motion to Dismiss Action Against Defendants City of Delta, Suppes, Gore, Anderson, [and] Spiker" filed March 9, 2000; (2) "Motion to Dismiss and for Stay of Discovery, and Brief in Support Defendants Delta County Department of Social Services, Delta County Sheriff's Department, Mike Worthington, Annette Ornelas, Susan Blaine, and William Lemoine" filed March 14, 2000; and (3) "[Littlefield's] Motion to Dismiss" filed March 15, 2000. Jurisdiction is based on 28 U.S.C.A. § 1331 (West 1993), section 1983, section 1985, and 28 U.S.C.A. § 1367 (West 1993).

## FACTS

The facts as alleged in this case are tragic. In the early morning hours of January 4, 1999, Delta Police Officers Doug Porter and Rodney Sanchez responded to a call that a two-year-old child, Kayanna Pierce, was not breathing at the residence of Bethany Gerard, Kayanna's mother. (Am. Compl. ¶ 21 [filed Sept. 15, 2000].) Upon arrival, Officer Porter discovered that Kayanna was not breathing and had no pulse. (*Id.* ¶ 20.) Kayanna

---

1. Plaintiffs complaint also names the Colorado State Department of Human Services and Susan Worthington as defendants. On February 28, 2000, the parties filed a stipulated motion to dismiss these defendants. I grant-

ed the motion on March 1, 2000. (*See* Order of Dismissal [filed Mar. 1, 2000].) Because Susan Worthington is no longer a defendant in this case, any reference to "Worthington" is a reference to Mike Worthington.

was taken by ambulance to the emergency room at the Delta hospital where, after efforts to revive her by Dr. Eckstein failed, she died. (*Id.* ¶ 21.) During his examination and treatment of Kayanna, Dr. Eckstein discovered bruises on Kayanna's chest and head. (*Id.* ¶ 22.) Because Dr. Eckstein could not determine the cause of death, he notified the coroner, Dr. Thomas Canfield, who concluded that Kayanna's death resulted from multiple non-accidental blunt-force traumas and that Kayanna's death was a homicide. (*Id.* ¶¶ 22–23.) Jeremiah Duran, Bethany Gerard's live-in boyfriend was charged with first-degree murder in Kayanna's death. (*Id.* ¶ 24.) No charges were filed against Gerard, and, in November 1999, a jury acquitted Duran on the charge of first-degree murder. (*Id.*)

Prior to Kayanna's death, in May 1998, Littlefield, a licensed social worker, began watching Kayanna and her brothers.[2] (*Id.* ¶ 25.) Littlefield quit her position in September 1998, however, "because of the kids showing up with too many unexplained bruises and bumps." (*Id.* ¶ 25.) Littlefield notified Delta Social Services of her concerns but was told that Delta Social Services could do nothing but monitor the children for future injuries. (*Id.*) Despite Littlefield's complaint, Delta Social Services did not initiate a child abuse investigation. (*Id.*)

On August 30, 1998, during a visit with her father, Victor Pierce, in Aurora, Colorado, Kayanna's aunt, Cheryl Pierce, discovered a burn and bruises on Kayanna. (*Id.* ¶ 26.) Mr. Pierce took Kayanna to Aurora Presbyterian Hospital where she was examined by Dr. Ronald Liss. (*Id.*)

Dr. Liss concluded that Kayanna's injuries were the result of child abuse or child neglect and notified the Arapahoe County Department of Social Services ("Arapahoe Social Services"). (*Id.* ¶ 27.) On August 31, 1998, Arapahoe Social Services assigned Marilyn Robinson to investigate the allegations of child abuse reported by Dr. Liss and Mr. Pierce. (*Id.* ¶ 28.) Robinson interviewed Kayanna's brothers, then four-year-old Jacob and then three-year-old Jered, both of whom informed Robinson that Gerard and Duran hit them with a belt on their legs and hands. (*Id.*) On August 31, 1998, Mr. Pierce reported the suspected abuse of Kayanna to Delta Social Services. (*Id.* ¶ 29.) On September 1, 1998, Robinson informed Delta Social Services and local law enforcement of her observations. (*Id.*)

On August 31, 1998, Delta Social Services assigned Caseworker Annette Ornelas to investigate the allegations of abuse reported by Mr. Pierce. (*Id.* ¶ 30.) With the help of Delta Police Detective Travis Anderson, Ornelas located Gerard and informed Detective Anderson that she would investigate the matter and get back to Anderson. (*Id.* ¶ 31.) On September 15, 1998, Detective Anderson interviewed Gerard who denied ever hitting her children and claimed that Kayanna's bruises occurred while she was at the babysitters, first Littlefield, then Tela Horn. (*Id.* ¶ 32.) Littlefield denied inflicting these injuries, and Horn informed Anderson of additional incidents of abuse to the Pierce children. (*Id.*) Despite this information from Littlefield and Horn, Anderson concluded that the allegations of child abuse were unfounded.[3] (*Id.* ¶ 33.) Consequently,

---

2. Plaintiffs allege that the Littlefield is an employee or agent of Delta Social Services because Delta Social Services appointed her to provide counseling services to the Pierce children following Gerard's request for such services. (Am.Compl.¶ 141.) I note that plaintiffs' allegations are somewhat inconsistent with respect to Littlefield's conduct in this matter. On the one hand, plaintiffs allege that Littlefield reported her concerns about possible child abuse to Delta Social Services, yet on the other hand, plaintiffs'

allege Littlefield violated their constitutional rights by not reporting her concerns. (*See id.* ¶¶ 25, 143–44.)

3. Apparently Anderson did not receive this information until after Kayanna's death because plaintiffs allege that the Delta Police Department did not interview Littlefield and Horn until January 8, 1999, four days after Kayanna died. (*See* Am. Compl. ¶ 48.) Thus, it is unclear as to what point in time and with what amount of information the Delta Police

neither Anderson nor the Delta Police Department took any protective action to remove Kayanna or her brothers from Gerard and Duran's house. (*Id.*)

On September 21, 1998, Ornelas interviewed Gerard. (*Id.* ¶ 34.) During this interview, Gerard admitted that she hit her children with her hand and a belt when they were bad. (*Id.*) Gerard, however, disavowed any notion that she abused her children, and offered innocuous explanations for Kayanna's injuries, such as she fell out a chair and she pinched her foot in her walker. (*Id.*) Although Ornelas was aware of Jered and Jacob's statements to Robinson that Gerard and Duran abused them, Ornelas failed to interview either of them or Duran. (*Id.*) Nor did Ornelas' report take into account the boys' statements. (*Id.*) Ultimately, Ornelas concluded that the allegations of child abuse were "unfounded" and merely a "custody dispute" between Mr. Pierce and Gerard, and, on October 8, 1998, closed the case. (*Id.* ¶ 35.) On October 16, 1998, however, Ornelas stated in her Family Preservation Program Referral Sheet that: (1) the Pierce children's continued presence in the Gerard/Duran home was likely to result in physical or emotional injury due to abuse or neglect as defined by Colorado statute; (2) Delta Social Services believed that the Gerard family was at risk for possible abuse or neglect; and (3) out-of-home placement was most likely to remedy this dysfunction. (*Id.* ¶ 36.) Despite this letter, defendants did not take any action to remove the Pierce children from Gerard or ensure their safety. (*Id.*)

On November 13, 1998, Kayanna sustained first-and second-degree burns to her left hand and right cheek while in the care of Duran. (*Id.* ¶ 37.) Duran told the police that Kayanna burned herself when she picked up a burrito which was too hot and tried to eat it. (*Id.* ¶ 38.) Duran also told the police that both Jacob and Jered

were present during the incident, but no one from the Delta Police Department or Delta Social Services questioned the boys about the incident. (*Id.*) Instead, the Delta Police Department and Delta Social Services accepted Duran's explanation, and again closed their investigation as "unfounded." (*Id.*)

As a result of Kayanna's November 13, 1998, injury, Mr. Pierce notified Sergeant Gore of the Delta Police Department and Delta Social Services of Kayanna's recent and past injuries and the opinion of Dr. Liss that Kayanna's August 31, 1998, injuries were the result of child abuse. (*Id.* ¶¶ 39, 41.) Sergeant Gore assigned Officer Spiker to investigate Mr. Pierce's complaint, who, according to plaintiffs, conducted only a cursory investigation at Gerard's home. (*Id.* ¶ 40.) Officer Spiker reported that Kayanna's facial "burrito" burn looked like a rug burn and that he believed the circumstances surrounding Kayanna's injury to be suspicious. (*Id.*) Although Officer Spiker noted in his report that the matter would be investigated further, no further investigation took place. (*Id.*) Moreover, it was not until January 8, 1998, four days after Kayanna's death, that the Delta Police Department interviewed Littlefield and Horn regarding their knowledge of the alleged child abuse perpetrated against Kayanna and her brothers. (*Id.* ¶ 48.) During those interviews, Littlefield and Horn recounted several instances where they observed suspicious injuries to the children which they suspected were the result of child abuse and/or child neglect. (*Id.* ¶¶ 48–50.) Specifically, Hom recounted one instance where Jered told her that Duran had hit him across the face for breaking a toy. (*Id.* ¶ 52.)

On November 30, 1999,[4] Ornelas testified at Mr. Pierce and Gerard's divorce proceeding. (*Id.* ¶ 42.) Ornelas testified

Department had when it concluded that the allegations of child abuse were unfounded.

**4.** Although plaintiffs' amended complaint alleges that Ornelas testified on November 30,

1999, it seems more likely that the actual date of Ornelas' testimony was November 30, 1998.

that her investigation did not raise any concerns about the health and safety of the Pierce children. (*Id.*) Ornelas testified that she believed that, up to that time, the reports of child abuse were unfounded. (*Id.*) Still concerned for the well-being of his children, Mr. Pierce continued to report the aforementioned incidents to Delta Social Services and requested that Delta Social Services take action to protect his children from Gerard and Duran. (*Id.* ¶ 43.) During one of his telephone calls to Delta Social Services, Mr. Pierce alleges that Ornelas threatened to report him and pursue a criminal prosecution against Mr. Pierce for harassment if he did not stop calling Delta Social Services. (*Id.*)

On January 4, 2000, one year after Kayanna's death, plaintiffs filed their complaint in this court, asserting claims under section 1983, section 1985, and Colorado state law. (Compl. [filed Jan. 4, 2000].) On March 9, March 14, and March 15, 2000, defendants filed various motions to dismiss all of plaintiffs' claims against them. (Mot. to Dismiss Action Against Defs. City of Delta, Suppes, Gore, Anderson, Spiker [filed Mar. 9, 2000] [hereinafter "City Defs.' Br."]; Mot. to Dismiss and for Stay of Discovery, and Br. in Supp. of Defs. Delta County Department of Social Services, Delta County Sheriff's Department, Mike Worthington, Annette Ornelas, Susan Blaine, and William Lemoine [filed Mar. 14, 2000] [hereinafter "County Defs.' Br."]; Mot. to Dismiss [filed Mar. 15, 2000] [hereinafter "Littlefield's Br."].) Defendants argue plaintiffs' section 1983 and section 1985 claims should be dismissed for several reasons, including: (1) failure to state a claim upon which relief may be granted; and (2) qualified immunity. (*See* City Defs.' Br. at 3–9; County Defs.' Br. at 3–14; Littlefield's Br. at 3–7.) With respect to plaintiffs' state-law conspiracy claim, defendants argue that it is barred by the Colorado Governmental Immunity Act, Colo.Rev.Stat. §§ 24–10–101 to 120 (1999). (City Defs.' Br. at 9–12; County Defs.' Br. at 13–14.)

On September 8, 2000, I held a hearing on defendants' motions to dismiss. At the conclusion of the hearing, I granted plaintiffs leave to amend their complaint for the sole purpose of substituting William Blair, the Delta County Sheriff, as a party-defendant in place of the Delta County Sheriff's Department. (*See* Courtroom Mins. [filed Sept. 8, 2000].) On September 15, 2000, plaintiffs filed their amended complaint, again asserting claims under section 1983, section 1985, and Colorado state law.[5] (Am.Compl.) Specifically, plaintiffs' amended complaint alleges section 1983 claims for: (1) reckless investigation against Delta Social Services and the Delta Police Department ("first claim"); (2) failure to train and/or supervise against Delta Social Services, the Delta Police Department, and the Delta County Sheriff ("second claim"); (3) deliberate indifference against Delta Social Services, the Delta Police Department, and the Delta County Sheriff ("third claim"); (4) failure to report against Worthington ("fourth claim"); (5) reckless investigation and inadequate training and/or supervision against Delta Social Services Director Blaine, Delta Police Chief Suppes, Delta Social Services Children Services Supervisor Lemoine, and Sergeant Gore ("fifth claim"); (6) reckless investigation against Ornelas ("sixth claim"); (7) failure to report against Littlefield ("seventh claim"); (8) failure to report and reckless investigation against Sheriff's Deputy Worthington, Detective Anderson, Officer Spiker, and Sergeant Gore ("eighth claim"); (9) threat to

---

**5.** Despite my clear directive that the sole purpose of allowing plaintiffs to amend their complaint was to substitute Blair as a defendant for the Delta Sheriff's Department, plaintiffs' amended complaint contains new allegations unrelated to the reason for which I gave plaintiffs leave to amend. (*See* Am. Compl.

¶¶ 76–89.) While it is generally the practice of this court to strike those portions of plaintiffs' amended complaint that violate a court directive, I see no reason to do in this case because plaintiffs' new allegations do not alter my analysis of the legal issues raised in the instant motions to dismiss.

pursue malicious prosecution against Delta Social Services ("ninth claim"); and (10) severance of the familial relationship against Delta Social Services and the Delta Police Department ("tenth claim"). (*Id.* ¶¶ 90–168.) Plaintiffs also allege (1) a section 1985 claim for gender discrimination ("eleventh claim"), and (2) a civil conspiracy claim under Colorado state law ("fourteenth claim"). (*Id.* ¶¶ 169–174, 180–184.) Plaintiffs base their section 1983 and section 1985 claims on deprivations of their substantive and procedural due process rights and equal protection rights under the Fourteenth Amendment. (*Id.* ¶¶ 83, 85, 88–89.)

On October 11, 2000, plaintiffs filed their "Stipulation for Dismissal and Withdrawal of Claim for Relief" in which plaintiffs moved to: (1) dismiss with prejudice all of their claims against the City, Delta Police Department, Delta Police Chief Suppes, Delta Police Sergeant Gore, Delta Police Officers Anderson and Spiker, Delta County Sheriff's Department, Delta County Sheriff William Blair, and Deputy Sheriff Worthington; and (2) withdraw their fourteenth claim. (Stipulation for Dismissal and Withdrawal of Cl. for Relief [filed Oct. 11, 2000].) I am entering an order granting plaintiffs' motion. Accordingly, the only defendants remaining in this case are Delta Social Services and its employees Ornelas, Blaine, Lemoine, and Littlefield. I now turn to their motions to dismiss.[6]

## ANALYSIS

### 1. *Legal Standard*

For the purposes of a motion to dismiss under rule 12(b)(6), the pleading is construed in the light most favorable to the non-moving party, and its allegations are taken as true. *See, e.g., Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1533 (10th Cir.1992). The court considers whether the allega-

tions set forth in the pleading constitute a statement of a claim under rule 8(a) of the Federal Rules of Civil Procedure. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363, at 460 (2d ed.1990). Rule 8(a) provides that the pleading need only set out a generalized statement of facts from which the opposing party will be able to frame a responsive pleading. Fed.R.Civ.P. 8(a). Thus, in appraising the sufficiency of the allegations, "the [pleading] should not be dismissed for failure to state a claim unless it appears beyond doubt that [plaintiff] can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Daigle,* 972 F.2d at 1533. Additionally, the court must determine if plaintiff's allegations provide any basis for relief on any possible theory, as the court should not dismiss a complaint merely because plaintiff's allegations do not support the particular legal theory on which the plaintiff intends to proceed. *See* 5A Charles A. Wright & Arthur R. Miller, § 1357, at 336–37.

### 2. *Section 1983 Liability—General Principles*

Section 1983 provides:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

**6.** On October 5, 2000, Littlefield filed her "Motion to Dismiss Amended Complaint" in response to plaintiffs' filing of their amended complaint. Because Littlefield's latest motion raises the same arguments that she made in her original motion and my analysis of those arguments as well as the arguments of the

other defendants is unaffected by the amendments made to plaintiffs' complaint, I see no reason to order separate briefing directed to plaintiffs' amended complaint. Accordingly, I shall treat defendants' motions to dismiss as motions to dismiss plaintiffs' amended complaint.

42 U.S.C.A. § 1983. For purposes of this statute, municipalities and other local governmental bodies may be considered "persons." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). To establish a claim under section 1983, then, "a plaintiff must allege (1) deprivation of a federal [or constitutional] right by (2) a person acting under color of state law." *Watson v. City of Kansas City, Kansas*, 857 F.2d 690, 694 (10th Cir.1988) (citing *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 [1980] ).

### a. Proper Parties to a Section 1983 Suit

As an initial matter, I address the contention of Delta Social Services that it is not proper party to this lawsuit. (County Defs.' Br. at 5.) Although Delta Social Services does not expressly articulate the basis for its assertion, I interpret Delta Social Services' argument to be that it is not a "person" within the meaning of section 1983.[7] Plaintiffs raise two arguments in response. Plaintiffs first contend that Delta Social Services is a proper defendant under section 1983 jurisprudence. (Pls.' Combined Resp. to Defs.' Mots. to Dismiss and Supporting Br. 18 [filed Mar. 29, 2000] [hereinafter "Pls.' Combined Resp."].) Alternatively, plaintiffs contend that they can still maintain an action against Delta Social Services' employees in their official capacity even if Delta Social Services itself is not a proper defendant. (*Id.* at 19.)

 Although *Monell* holds that municipalities and other local governmental bodies are persons within the meaning of section 1983, the *Monell* court limited its holding to "local government units which are not considered part of the State for Eleventh Amendment purposes." *Monell*, 436 U.S. at 689 n. 55, 98 S.Ct. at 2035 n. 55. The court reiterated this limitation in

*Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), wherein the Court held that "neither a State nor its officials acting in their official capacities are 'persons' under [section] 1983." When read together, then, these cases stand for the proposition that local governmental bodies which are considered "arms of the State" for Eleventh Amendment immunity purposes are not "persons" within the meaning of section 1983. In determining whether a political body is an "arm of the State," courts consider four factors: (1) the characterization of the governmental unit under state law; (2) the guidance and control exercised by the state over the governmental unit; (3) the degree of state funding received; and (4) the governmental unit's ability to issue bonds and levy taxes on its own behalf. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir.1999) (citations omitted); *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 994 (10th Cir.1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568 (1977)). The third and fourth factors address whether a judgment against the political body would be paid out of the state treasury. *Id.* at 1233 (citations omitted). The key question in this analysis is "whether funds to satisfy a money judgment come directly from the state or indirectly through commingled state and local funds or state indemnification provisions." *Id.* (citations omitted).

 While the Tenth Circuit has yet to address whether an entity such as Delta Social Services is a person under section 1983, the Colorado Court of Appeal squarely addressed the issue in *Wigger v. McKee*, 809 P.2d 999, 1002–04 (Colo.Ct. App.1990). There, the court considered whether the Arapahoe County Department

---

7. Not only does Delta Social Services fail to expressly state the basis for its argument, but it utterly fails to cite to the relevant case law which would support its position. Indeed, not a single case relied upon by Delta Social Services addresses the issue at hand: whether

a Colorado social services department is a person within the meaning of section 1983. The court is mystified by Delta Social Services' inexplicable inability to direct the court to the pertinent case law.

of Social Services ("Social Services") was a "person" under section 1983. After applying the above factors for determining whether a governmental entity is an arm of the State, the court concluded that Social Services was an arm of the State, and, thus, it could not be sued under section 1983. *Id.* The court found that Social Services has very few powers independent of the state and is designated by Colorado statute as "agents of the state department." *Id.* at 1004. The court also found that Social Services received eighty percent of it funding from the state, and that no provision existed for allowing Social Services to use its own funds to satisfy judgments awarded against it. *Id.*

Although the question of whether a governmental body is a "person" for section 1983 purposes is necessarily a question of federal law, plaintiffs have not provided, nor has my own research revealed, any persuasive authority which would cause me to diverge from the Colorado Court of Appeals well-reasoned analysis in *Wigger.* *Howlett v. Rose,* 496 U.S. 356, 375, 110 S.Ct. 2430, 2442, 110 L.Ed.2d 332 (1990) (holding that "[t]he elements of, and defense to," a section 1983 action are defined by federal law). Therefore, I adopt *Wigger's* holding and conclude that Delta Social Services is not a "person" within the meaning of section 1983. Accordingly, plaintiffs' section 1983 claims against Delta Social Services are hereby dismissed.[8] Further, because a suit against an officer of the state in his or her official capacity is "no different from a suit against the State itself," plaintiffs' official-capacity section 1983 claims against Delta Social Services employees Ornelas, Blaine, Lemoine, and Littlefield are also dismissed. *Will,* 491 U.S. at 71, 109 S.Ct. at 2312; *see also Sutton,* 173 F.3d at 1237.

### 3. Section 1983—Individual–Capacity Claims

#### a. Direct Liability for Failure to Report and Reckless Investigation

Plaintiffs' amended complaint alleges numerous individual-capacity section 1983 claims, which fall into two general categories. Plaintiffs' first category of claims attempt to impose section 1983 liability directly on Ornelas and Littlefield for their alleged failure to report and adequately investigate allegations of child abuse as required by Colorado's Child Protection Act of 1987, Colo.Rev.Stat. §§ 19–3–301 to 703 (1999) [hereinafter "Child Protection Act"]. (Am.Compl.¶¶ 134–44.) The crux of these claims is that defendants' failure to comply with the provisions of the Child Protection Act subjected the Pierce children to ongoing child abuse at the hands of Gerard and/or Duran which culminated in Kayanna's death.[9] (*Id.* ¶¶ 139, 144.) Plaintiffs allege that defendants' failure to remove the Pierce children from Gerard's home or otherwise protect them from child abuse violated their constitutional rights under the Fourteenth Amendment. (Pls.' Combined Resp. at 1–2.)

Defendants move to dismiss plaintiffs' claims on the grounds that: (1) plaintiffs have failed to a state a valid section 1983 claim because defendants do not have a constitutional duty to protect against so-called "private violence" inflicted by non-

---

8. Specifically, this dismissal. encompasses (1) plaintiffs' first, second, third, and tenth claims to the extent that plaintiffs assert section 1983 claims against Delta Social Services, and (2) plaintiffs' ninth claim (threat to pursue malicious prosecution) in its entirety.

9. Specifically, plaintiffs rely on Colo.Rev.Stat. § 19–3–304(1) which requires, peace officers and social workers, among others, to "immediately report or cause a report to be made to the county department [of social services] or local law enforcement" when the peace offi-

cer or social worker "has reasonable cause to know or suspect that a child has been subjected to abuse." A willful violation of this requirement is a class three misdemeanor and subjects the violator to civil liability "for damages proximately caused thereby." *Id.* § 19–3–304(4)(a)–(b). Additionally, plaintiffs rely on Colo.Rev.Stat. § 19–3–308 which sets out the various procedures that social services departments and law enforcement agencies must follow when they receive a report of child abuse.

state actors such as Gerard and Duran; and (2) defendants are entitled to qualified immunity. (County Defs.' Br. at 2–5; Littlefield's Br. at 2–6.) Defendants argue that the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and subsequent Tenth Circuit cases foreclose plaintiffs' ability to sustain a section 1983 claim predicated upon private violence. (*Id.*) Plaintiffs, unsurprisingly, argue that their section 1983 claims fall outside the purview of *DeShaney* and its progeny. (Pls.' Combined Resp. at 6–12.) Thus, plaintiffs argue that they have stated valid section 1983 claims based upon a deprivation of their Fourteenth Amendment substantive and due process rights. (*Id.* at 6–15.)

### i. Substantive Due Process

In deciding whether plaintiffs have pled a cognizable section 1983 claim, the court must first determine whether plaintiffs can allege the deprivation of a constitutional right. *Sutton*, 173 F.3d at 1237; *Graham v. Independent Sch. Dist. No. I–89*, 22 F.3d 991, 993 (10th Cir.1994) (citing *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979)). The starting point for analyzing the validity of plaintiffs' substantive due process claim is *DeShaney*, where the Supreme Court enunciated the now firmly entrenched rule that the Due Process Clause of the Fourteenth Amendment does not impose a constitutional duty upon a state to protect individuals from private violence. *DeShaney*, 489 U.S. at 195–97, 109 S.Ct. at 998; *Sutton*, 173 F.3d at 1237 (citing *DeShaney* for the proposition that "[i]t is well-settled that a state does not have a constitutional duty to protect its citizens from private violence"). In *DeShaney*, the Winnebago County Department of Social Services ("County") received numerous reports that four-year-old Joshua was being abused by his father. *Id.* at 192–93, 109 S.Ct. at 1001–02. The County interviewed the father and even obtained an order placing Joshua in temporary custody of the hospital, but returned Joshua to his father shortly thereafter. *Id.* Following this episode, the County continued to receive reports of Joshua's abuse, yet did nothing to remove him from his father's custody. *Id.* Eventually, Joshua's father beat him so severely that he suffered permanent brain damage. *Id.* Joshua and his mother sued the County and several of its employees, alleging that the County had violated the Fourteenth Amendment by failing to intervene on his behalf and protect him from his father's abuse. *Id.*

The Supreme Court rejected Joshua's argument that the County acquired an affirmative duty to protect him from his father's abuse based on the fact that the County was aware of the alleged abuse. *Id.* at 195, 109 S.Ct. at 1003. Relying on the premise that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protects them from each other," the Court held that:

> [N]othing in the Due Process Clause itself requires a State to protect the life, liberty, and property of its citizens against invasions by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means . . . .
>
> Consistent with these principles, . . . the Due Process Clause[ ] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government may not deprive the individual.

*Id.* at 195–95, 109 S.Ct. at 1003.

The Tenth Circuit has recognized two exceptions to the general *DeShaney* rule that a state is not constitutionally obligated to protect individuals against private

violence: (1) the special-relationship doctrine, and (2) the danger-creation theory. *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir.1995). The special-relationship doctrine flows directly from the *DeShaney* opinion itself, and applies in situations where the state imposes limitations upon an individual's freedom to act on his or her own behalf. *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006 ("[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.") The Tenth Circuit has held that this doctrine applies to children who are in the state's legal and physical custody at the time the private violence occurred. *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir.1992) (holding that state had constitutional duty to protect foster child in its legal and physical custody from sexual assault by another child).

Here, plaintiffs' complaint alleges that a special relationship existed between the Pierce children and defendants. (Am. Compl.¶¶ 70–71.) In their combined response to defendants' motions to dismiss, however, plaintiffs do not challenge defendants' contention that the special-relationship doctrine does not apply. Rather, plaintiffs appear to concede that their factual allegations do not support the existence of a special relationship. (Pls.' Combined Resp. at 6.) So as to leave no room for doubt, my independent review of plaintiffs' amended complaint satisfies me that the special-relationship doctrine is inapposite because plaintiffs fail to allege that any of the Pierce children were in state custody at the time they were abused by Gerard and/or Duran. *See Currier v. Doran*, 23 F.Supp.2d 1277, 1280 (D.N.M.1998) (holding special-relationship doctrine inapplicable where plaintiffs failed to allege abused child was in state custody at time father killed him); *A.S. By and Through*

*Blalock v. Tellus*, 22 F.Supp.2d 1217, 1220–22 (D.Kan.1998) (holding that legal custody without physical custody by state insufficient to trigger special-relationship doctrine). Accordingly, plaintiffs must proceed under the danger-creation theory in order for their substantive due process claims to survive defendants' motions to dismiss.

■■ Under the danger-creation theory, "[s]tate officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Armijo v. Wagon Mound Pub. Schools*, 159 F.3d 1253 1262 (10th Cir.1998) (internal quotation marks and citations omitted); *see also Sutton*, 173 F.3d at 1237; *Graham*, 22 F.3d at 995. The Tenth Circuit articulated a five-part test in *Uhlrig* to determine whether a defendant created a special danger for the plaintiff. *Uhlrig*, 64 F.3d at 574. To state a viable substantive due process claim under the danger-creation theory, the plaintiffs must allege that: (1) plaintiffs were members of a limited and specifically definable group; (2) defendants' conduct put plaintiffs at substantial risk of serious, immediate, and proximate harm; (3) the risk was obvious or known; (4) defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, "shocks the conscience" of federal judges. *Id.* To bring the *Uhlrig* test in line with *DeShaney*, the Tenth Circuit held in *Armijo*, that "in addition to meeting *Uhlrig's* five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased the danger in some way." *Armijo*, 159 F.3d at 1263; *accord Sutton*, 173 F.3d at 1238 (noting that danger-creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger" [internal quotation marks and citations omitted] ). "In other words, if the danger to the plaintiff existed prior to the state's intervention [or lack thereof], then even if the state put the plaintiff back in that

same danger, the state would not be liable because it could not have created a danger that already existed."[10] *Id.*

Defendants argue that plaintiffs have failed to state a claim under the danger-creation theory because: (1) defendants did not take any affirmative acts which created the danger which the Pierce children were exposed to; and (2) defendants' failure to report and/or adequately investigate allegations of child abuse does not amount to conscience-shocking conduct. (County Defs.' Br. at 3–4.) Plaintiffs vigorously argue that they have pled the requisite elements of a danger-creation theory claim. (Pls.' Combined Resp. at 6–12.) Specifically, plaintiffs argue that defendants' failure to comply with the mandatory reporting and investigation provisions of the Child Protection Act created the danger of continued child abuse, which ultimately led to Kayanna's death. (*Id.* at 7–10.) Plaintiffs contend that, because Child Protection Act legislatively mandates that defendants report and investigate allegations of child abuse, plaintiffs have an "entitlement" to protective services under the Child Protection Act which enjoy due process protection against state deprivation.[11] (*Id.* at 8.)

■ While I find this to be an extremely difficult case, after much consideration of plaintiffs' argument, I conclude that the allegations in plaintiffs' complaint, even when viewed in a light most favorable to plaintiffs, fail to state a substantive due process claim under the danger-creation theory. Even assuming that plaintiffs' allegations meet *Uhlrig*'s five part-test, it cannot fairly be said that defendants undertook any affirmative acts which created or increased the risk of harm to plaintiffs. Although the distinction between cases in which the state has merely failed to protect its citizens from those in which in the state affirmatively injured them is not always an easy one to draw, *DeShaney* requires a federal court to make such as distinction—distinguishing a state's "affirmative misdeeds from its omissions, to differentiate misfeasance from nonfeasance." *S.S. ex rel. Jervis v. McMullen,* 186 F.3d 1066, 1074 (8th Cir.1999) *opinion vacated and rehr'g en banc granted without published opinion* 1999 U.S.App. Lexis 24361 (Sept. 30, 1999). Here, defendants' alleged failure to report and investigate credible charges of child abuse, while certainly indefensible, does not rise to the level of actionable constitutional malfeasance. Rather, defendants' failure to act can best be described as nonfeasance, making this case indistinguishable from *DeShaney.* Indeed, as in *DeShaney,* "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *DeShaney,* 489 U.S. at 203, 109 S.Ct. at 1007. Thus, unlike "doer[s] of harm," who are subject to liability under the danger-creation theory, defendants are merely "inept rescuers" outside of the reach of the Due Process Clause and the danger-creation

---

10. The impetus for adding this additional requirement was the Supreme Court's pronouncement in *DeShaney* that:

> While the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render anymore vulnerable to them. . . . [I]t placed him in no worse position than that in which he would have been had *it not acted at all. Armijo,* 159 F.3d at 1263 (quoting *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006).

11. Plaintiffs attempt to distinguish this case from *DeShaney* on the grounds that the *DeShaney* court declined to address Joshua's contention that "the Wisconsin child protection statutes gave Joshua an 'entitlement' to receive protective services in accordance with the terms of the statute which would enjoy due process protection under state deprivation under our decision in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)." *DeShaney,* 489 U.S. at 196 n.2, 109 S.Ct. at 1003 n. 2. Whether plaintiffs have a statutory "entitlement" protected under *Roth,* however, is more properly a procedural due process issue rather than a substantiative due process issue. Because plaintiffs argue that the Child Protection Act's reporting and investigation requirements confers both a substantive and procedural right upon plaintiffs, I address the Child Protection Act's application in both contexts.

theory. *K.H., Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir.1990) (recognizing right of child in state custody not to be handed over to known abusive parent or other custodian).

It must be remembered that at all times the violence perpetrated against Kayanna and her brothers came from within the Gerard household at the hands of non-state actors. In other words, the danger to Kayanna and her brothers existed prior to any nonfeasance on the part of defendants. In situations such as this one where the state actors did not disturb the status quo by removing the children and then placing them in an abusive environment, or removing the children from an abusive environment and then returning them to that environment, but, rather, simply failed to remove the children from the abuser in the first place, courts have been reluctant to accept the danger-creation theory as a means of circumventing *DeShaney*. Compare, *e.g., Tellus*, 22 F.Supp.2d at 1222 (rejecting danger-creation theory where defendants had knowledge of abuse but failed to remove child from abuser), *with Currier*, 23 F.Supp.2d at 1280–82 (distinguishing *DeShaney* on the ground that defendants removal of child from home disturbed status quo and state could not "create a dangerous condition for the child by knowingly or recklessly turning control of the child over to an abusive person"). Thus, by leaving Kayanna with her mother and Duran, defendants did not create or exacerbate any danger to Kayanna because she was in "no worse position than [she] would have been had [defendants] not acted at all." *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 998; *see also Tellus*, 22 F.Supp.2d at 1222.

■ My analysis, moreover, does not change just because the Child Protection Act imposes mandatory reporting and investigation procedures on defendants. It is well-settled that a violation of state law duty, by itself, is insufficient to give rise to a section 1983 claim. *Jones v. City & County of Denver*, 854 F.2d 1206, 1209 (10th Cir.1988) (rejecting argument that

violation of Colorado state law can give rise to section 1983 claim); *see also D.R., by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1375 (3d Cir. 1992) (holding that violation of state statute which required teachers to report sexual abuse did not provide basis for section 1983 claim under danger-creation theory). Section 1983 liability arises only from a violation of federal statutory or constitutional rights under color of state law. *Id.* Thus, "[i]llegality under the state statute can neither add to or subtract from [the] constitutional validity [of a state's actions]." *Archie v. City of Racine*, 847 F.2d 1211, 1216 (7th Cir.1988) (quoting *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944)). Plaintiffs, therefore, cannot maintain a substantive due process claim based on defendants' alleged violations of their duties under the Child Protection Act.

### ii. Procedural Due Process

Plaintiffs also allege that defendants' failure to comply with the mandatory provisions of the Child Protection Act violated their procedural due process rights. (Pls.' Combined Resp. at 12–15.) Plaintiffs argue that, because the Child Protection Act mandates reporting and investigation of child abuse allegations, they have a constitutionally-protected "entitlement" to protective services in accordance with the procedures set forth in the Child Protection Act. (*Id.* at 13.) Plaintiffs do not contend that the reporting and investigatory procedures contained in the Child Protection Act are inadequate; rather, plaintiffs contend that defendants failure to follow these procedures deprived them of a protected liberty interest without due process of law. (*Id.*)

■ It is well-settled that a state law which generates a legitimate claim of entitlement can create a protected interest under the Due Process Clause. *Barry v. Barchi*, 443 U.S. 55, 64 & n. 11, 99 S.Ct. 2642, 2649 & n. 11, 61 L.Ed.2d 365 (1979). State-created procedures, however, do not

create such an entitlement where none would otherwise exist. *See Olim v. Waki-nekona,* 461 U.S. 238, 250–51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). A constitutionally protected liberty interest arises where a state statute puts substantive limitations on official discretion and mandates a particular outcome under specific criteria. *Id.* at 249, 103 S.Ct. at 1747. In contrast, where the state statute creates a mandatory procedure but does not guarantee a particular substantive outcome, no protected liberty exists. *Tony L. By and Through Simpson v. Childers,* 71 F.3d 1182, 1185 (6th Cir.1995) (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989)).

■ Here, plaintiffs rely on defendants' failure to report allegations of child abuse as required by Colo.Rev.Stat. § 19–3–304(1), and defendants' failure to follow the proper investigatory procedures as required by Colo.Rev.Stat. § 19–3–308. Although mandatory under the Child Protection Act, the act of reporting child abuse to the proper authorities and having those authorities investigate the reports does not dictate a particular substantive outcome or guarantee, such as removal from the alleged abusers home or other protective measures. Instead, these provision only give plaintiffs "an expectation of receiving a certain process." *Childers,* 71 F.3d at 1186 (citations omitted). The Child Protection Act does not mandate that a child be placed in protective custody or otherwise removed from his or her home simply upon the filing of a report of alleged abuse. *See, e.g.,* Colo.Rev.Stat. 19–3–308(4)(b) ("Upon receipt of a report if the county department reasonable believes that an incident ... of abuse ... has occurred, it ... *may* file a petition in the juvenile court or the district court ... on behalf of such child. If immediate removal is necessary ... the child *may* be placed in protective custody ....") (em-

phasis supplied); *id.* § 19–3–405(2)(b)("Temporary protective orders *may* be requested by the county department of social services, a law enforcement officer ....") (emphasis supplied). Thus, while plaintiffs may have had an expectation that some form of protective services would be taken if defendants complied with the statutory procedures, the expectation of action is not enough to create a protected liberty interest under the Due Process Clause. *Childers,* 71 F.3d at 1186 (holding that Kentucky statute which required state to investigate reports of child abuse and take certain actions upon receipt of a report did not create a protected liberty interest).

My conclusion that the Child Protection Act does not provide plaintiffs with a constitutionally protected liberty interest is buttressed by the fact that, outside of the realm of foster care, the circuit courts of appeal have uniformly rejected the argument that children have a protected interest in the procedures for reporting and investigating child abuse, even where those procedures are mandatory. *See id.; Doe by Fein v. District of Columbia,* 93 F.3d 861, 867–71 (D.C.Cir.1996); *Doe by Nelson v. Milwaukee County,* 903 F.2d 499, 502–05 (7th Cir.1990); *Morgan v. Weizbrod,* No. 93–6324, 1994 WL 55607, *3 (10th Cir. Feb.23, 1994) (holding that *DeShaney* precludes reliance on Oklahoma's child protection statute to create entitlement which would support procedural due process claim). In *Doe by Nelson,* for example, the Seventh Circuit addressed a procedural due process claim similar to the one asserted here. In that case, the plaintiffs alleged that Wisconsin's child protection statutes—which, like Colorado's Child Protection Act, mandated the reporting and investigation of allegations of child abuse and imposed criminal sanctions for failing to make a report—conferred upon them a protected procedural due process right. *Doe by Nelson,* 903 F.2d at 501. The court rejected this argument, finding the plaintiffs' claim to an entitlement in the state-law reporting procedures "untena-

ble." [12] *Id.* at 504. The court went on to observe, that even if the plaintiffs could assert the existence of an entitlement to protective services, the court could not conceive of any additional process, other than resorting to state-law tort remedies, which could have possibly sufficed to prevent the wrongful "deprivation." *Id.* Similarly, in *Doe by Fein,* the District of Columbia Circuit held that the codification of the procedures for investigating child abuse did not create an entitlement to protective services because the District of Columbia had not assumed a constitutional obligation to protect children from abuse. *Doe by Fein,* 93 F.3d at 868 ("Indeed, Doe's 'procedural' due process claim appears to be little more than a recasting of the substantive due process claim rejected by the Supreme Court in *DeShaney.*"). In the end, both the District of Columbia Circuit and the Seventh Circuit concluded that the proper method for redressing an alleged failure to comply with state child protection statutes is an action for damages under state law. *Id.* at 870; *Doe by Nelson,* 903 F.2d at 505.

In sum, I conclude that plaintiffs have not alleged a cognizable section 1983 claim against Ornelas and Littlefield based on their failure to report or investigate properly the allegations of child abuse concerning the Pierce children. Neither the substantive or procedural component of the Due Process Clause supports plaintiffs' claims under the facts as alleged in their amended complaint. As one district court noted in a similar case:

> In conclusion, this Court is sympathetic to the plight of individuals like Joshua DeShaney and [plaintiffs], and, obviously, the Court's conclusion in interpreting the law is not meant as approving or condoning the terrible tragedies that have befallen these innocent individuals, nor is it intended to assess blame. The narrow question of law before this Court is whether these claims state a cause of action for a constitutional violation under the [D]ue [P]rocess [C]lause and the Supreme Court's existing precedent.

*Sapp v. Cunningham,* 847 F.Supp. 893, 899 (D.Wyo.1994). To allow plaintiffs to maintain their claims under the present circumstances would be tantamount to condoning "an end-run around the Supreme Court's opinion in *DeShaney,*" *Morgan,* 1994 WL 55607, at *3, and would ignore the Supreme Court's admonition that the Due Process Clause does not establish "a font of tort law to be superimposed upon whatever systems may already be administered by the States," *County of Sacramento v. Lewis,* 523 U.S. 833, 848, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998) (citations omitted). Thus, to extent that plaintiffs seek redress for defendants' failure to comply with the provisions of the Child Protection Act or other misdeeds, plaintiffs must do so under Colorado statutory and common law.[13] Accordingly, plaintiffs' sixth and seventh claims are hereby dismissed.[14]

---

12. Although the court's holding primarily holding dealt with persons who were not obligated to report suspected abuse, the court also held that the outcome does not change just because a person is obligated to report such suspicions. *Doe by Nelson,* 903 F.2d at 503 n. 8 ("Consequently, the Does gain no advantage from their belated assertion ... that the children's former babysitter. Kathy, was a 'day care worker' required under sections 48.981[2] and [3][a] to report her suspicions of child abuse.").

13. As noted earlier, the Child Protection Act imposes civil liability on those who willfully violate their reporting duty. Colo.Rev.Stat. § 19–3–304(4)(b). Despite asserting twelve substantive claims against defendants based largely on defendants' failure to report under the Child Protection Act, plaintiffs, surprisingly, do not assert a state-law claim under Colo. Rev.Stat. § 19–3–304(4)(b) against any defendant. Rather, plaintiffs' amended complaint focuses solely on federal causes of action. Accordingly, I offer no opinion on whether plaintiffs can maintain a state-law cause of action under the facts as alleged in plaintiffs' amended complaint.

14. Because I conclude that plaintiffs have failed to allege a deprivation of a constitutional right with respect to these claims, I need not address defendants' alternative argument that they are entitled to qualified immunity. *Hinton v. City of Elwood,* 997 F.2d 774, 780 (10th Cir.1993) (stating that threshold question is whether alleged conduct unconstitu-

### b. Liability for Failure to Train and/or Supervise

 Plaintiffs second category of individual-capacity section 1983 claims attempts to impose liability on Blaine, and Lemoine in their positions as supervisors for (1) failing to train or supervise adequately their subordinates, and (2) failing to adopt or implement a policy to prevent the continued child abuse inflicted upon Kayanna and her brothers. (Am. Compl.¶¶ 127–33.) Generally, supervisors may be held individually liable for failing to adopt or implement a policy or training of subordinates to prevent deprivations of constitutional rights. *Sutton,* 173 F.3d at 1241 (citations omitted). Because neither Ornelas nor Little field acted unconstitutionally, however, there is no basis for imposing section–1983 supervisor liability upon Blaine and Lemoine for failure to train or adopt a policy to prevent the continued child abuse inflicted upon Kayanna and her brothers.[15] *See Hinton v. City of Elwood,* 997 F.2d 774, 783 (10th Cir.1993); *see also Ransom v. Wagoner County,* No. 99–5087, 2000 WL 293716, *3 (10th Cir. Mar.21, 2000). Consequently, plaintiffs' fifth claim is dismissed.[16]

### 4. Section 1983—Municipal Liability and Official–Capacity Claims

 A municipality may not be held liable under section 1983 solely because its employees inflicted injury on the plaintiff. *Hinton,* 997 F.2d at 782 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037). Rather, to establish municipal liability a plaintiff must show: (1) the existence of a municipal policy or custom; and (2) that there is a direct link causal link between the policy or custom and the injury alleged. *Id.* (citing *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d

412 (1989)). Liability may be imposed on a municipality if the execution of a policy or custom caused an individual to suffer a constitutional deprivation and the policy or custom was the "moving force" behind the constitutional deprivation. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38. Thus, the Tenth Circuit has held that "local governing bodies are liable for constitutional deprivations when the improper action stems from a 'decision officially adopted and promulgated by that body's officers.' " *Miller v. City of Mission, Kan.,* 705 F.2d 368, 374–75 (10th Cir.1983) (quoting *Monell,* 436 U.S. at 690, 98 S.Ct. at 2036). Absent a concrete official policy, an inference of the existence of a policy can only be drawn from a well-established pattern. *See Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). "Where the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of 'deliberate indifference' to the rights of its inhabitants." *Hinton,* 997 F.2d at 182 (quoting *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205).

Here, plaintiffs first, second, third, and tenth claims allege section–1983 municipal liability on the basis of: (1) reckless investigation; (2) failure to train and/or supervise; (3) deliberate indifference; and (4) severance of the right to familiar association. (*See* Am. Compl. ¶¶ 90–122, 163–68.) The only municipal defendant remaining in this case, however, is Delta Social Services, which, as stated above, is not a proper defendant under section 1983. *Wigger,* 809 P.2d at 1002–04. Consequently, plaintiffs' first, second, third, and tenth claims are dismissed.

---

tional, if not, no need to reach issue of whether law was clearly established).

**15.** At the September 8, 2000, plaintiffs conceded in response to my question that absent a constitutional violation by a subordinate, there is no basis for imposing liability on the subordinate's supervisor.

**16.** Plaintiffs' fifth claim also appears to allege that, aside from any supervisor liability, Blaine and Lemoine are directly liable for their failure to investigate adequately credible complaints of child abuse. To the extent that plaintiffs' fifth claim does assert such a claim, it fails for the same reasons that plaintiffs' claims against Ornelas and Littlefield fail.

### 5. *Section 1985—Eleventh Claim*

In addition to their section 1983 claims, Mr. Pierce alleges a section 1985 claim against Delta Social Services. (Compl.¶¶ 169–74.) Although Mr. Pierce does not specify the particular subsection of section 1985 under which he brings this claim, his allegations that Delta Social Services "custom, policy or practice" of "routinely disregard[ing] allegations of abuse and neglect where divorce or custody were pending as mere 'custody disputes'" "constitutes invidious gender-based discrimination" suggests that Mr. Pierce attempts to allege a claim under section 1985(3).[17] (*Id.* ¶¶ 170–71.) As with plaintiffs' section 1983 claims, however, Delta Social Services status as an "arm of the State" precludes Mr. Pierce from asserting such a claim against Delta Social Services when all Mr. Pierce seeks is an award of monetary damages. *Ellis v. University of Kansas Med. Ctr.,* 163 F.3d 1186, 1196 n. 13 (10th Cir.1998); *Housley v. Williams,* Nos. 92–6110, 92–6113, 92–6190, 92–6189, 92–6119, 92–6212, 92–6115, 92–6191, 1993 WL 76250, * 3 (10th Cir. Mar.12, 1993) (holding that Eleventh Amendment bars section 1983[5] claim against State of Oklahoma). Accordingly, plaintiffs' eleventh claim for relief is dismissed.

### 6. *Conclusion*

Based on the foregoing, it is therefore

ORDERED as follows:

1. Defendants Delta Social Services, Annette Ornelas, Susan Blaine, and William Lemoine's motion to dismiss (# 27) is GRANTED.

2. Defendant Littlefield's motion to dismiss (# 28) is GRANTED.

3. This case is hereby DISMISSED.

---

17. Section 1985(3) provides, in relevant part:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

Thus, to state a claim under section 1985(3) a plaintiff must allege "(1) the existence of a conspiracy[,] (2) intended to deny [him] equal protection under the laws or equal privileges and immunities of the laws[,] (3) resulting in an injury or deprivation of federally-protected rights, and [,](4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa,* 45 F.3d 1417, 1423 (10th Cir. 1995). Further, a section 1985(3) must contain an allegation of "class-based or racially discriminatory animus." *Bisbee v. Bey,* 39 F.3d 1096, 1102 (10th Cir.1994).